57 N.Y.2d 439 (1982)
Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Respondent,
v.
Chemical Bank, Appellant. (And a Third-Party Action.)
Court of Appeals of the State of New York.
Argued October 5, 1982.
Decided November 18, 1982.
Harold Weisblatt, John B. Wynne and Kenneth J. Kelly for appellant.
Roger J. Hawke for respondent.
Judges JASEN, GABRIELLI, JONES and MEYER concur with Judge FUCHSBERG; Chief Judge COOKE concurs in a separate opinion in which Judge WACHTLER concurs.
*441 FUCHSBERG, J.
This appeal requires us to explore the extent to which, if at all, immunity from liability accorded a drawee bank by section 3-405 (subd [1], par [c]) of the Uniform Commercial Code may be limited by the drawee's negligence in paying checks over forged indorsements.
The section at issue, commonly referred to in commercial circles as either the "fictitious payee" or "padded payroll" rule, provides: "An indorsement by any person in the name of a named payee is effective if * * * an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest".
The factual context in which the case is here is undisputed. The defendant, Chemical Bank, unaware that the indorsements of the payees' name were forged, routinely paid 13 checks drawn by the plaintiff, Merrill Lynch, on its Chemical account in the aggregate sum of $115,180. The forgeries were occasioned by chicanery of a Merrill Lynch *442 accounts payable employee who, by presenting his employer's New York check issuing department with false invoices which ostensibly represented obligations due its suppliers, caused checks to be issued to the order of these supposed creditors. The malefactor or accomplices then indorsed the names of the payees and, in face of the fact that New York addresses appeared below the payees' names, caused the checks to be deposited in California and Ohio bank accounts in names other than those to whose order they had been drawn. Seven of the checks were presented to Chemical by the Federal Reserve Bank (FRB) as collecting bank and the remainder by the depositary banks themselves. In due course, Chemical charged its Merrill Lynch account.
This suit, instituted by Merrill Lynch to recover the amount so debited, was brought on three theories. As set out in its complaint, the first was that "Chemical acted negligently and contrary to normal and accepted banking practices, breached its duty of good faith and failed to exercise ordinary care". Particularizing, it added that Chemical should have been alerted to the irregular nature of the checks because "the purported indorsements of the corporate payees were handwritten, and in many instances illegible", were indorsed "in blank, rather than for deposit only" and bore "second indorsements of unrelated persons or entities".[1] Reiterating the allegations of the first count, the second sounded in breach of contract and the third in conversion. In its answer, Chemical relied, among other affirmative defenses, on what, in the circumstances of this case, it took to be the exculpatory effect of section 3-405.
At the same time, Chemical, by way of a third-party summons and complaint, impleaded FRB essentially on the rationale that, if Merrill Lynch recovered, Chemical, in turn, should be made whole by FRB, which, as a collecting bank, would then have to be found in breach of its warranty of good title (Uniform Commercial Code, § 4-207). FRB countered with a motion for summary judgment, premised on the position that, under section 3-405, "endorsement *443 of the checks in the name of the payee thereof was sufficient and effective to transfer title to the instrument". On the same ground, Chemical thereupon cross-moved for partial summary judgment dismissing Merrill Lynch's complaint, except for the issue of staleness it had raised (see supra, n 1). Special Term denied both motions.
On appeal, the Appellate Division unanimously modified Special Term's order, on the law, by granting the motion directed to Chemical's third-party case against FRB. In so deciding, the court agreed that, under section 3-405 of the Uniform Commercial Code, the forged indorsements were effective to transfer title to the checks. However, as to Chemical's cross motion against Merrill Lynch, the court, by a vote of 3 to 2, found that section 3-405 was "not available to defendant to avoid liability for its own negligence" (82 AD2d 772, 773); on this view, it affirmed, thus relegating the issue of Chemical's negligence to trial.
On the present appeal,[2] which brings up for review Chemical's motion against Merrill Lynch only, the appellant in the main presses the point that its alleged negligence in disregarding irregularities in the indorsements may not deprive it of the benefits of section 3-405 of the Uniform Commercial Code and, in the alternative, that, in any event, it was not negligent because it was under no obligation to inspect the indorsements, a duty which, it insists, was the responsibility of FRB and the depositary banks alone. Echoing the dissent of Presiding Justice MURPHY and Justice SILVERMAN at the Appellate Division, Chemical also advances the pragmatic argument that a contrary reading of the statute would impose what, at least for large commercial banks, would constitute an unrealistically onerous and expensive burden of inspecting an "immense volume of checks", all the more so since these checks must be "processed and paid or alternatively, returned or dishonored by midnight of the following business day" (see David Graubart, Inc. v Bank Leumi Trust Co. of N. Y., 48 N.Y.2d 554, 557-558). Merrill Lynch, on the other hand, choosing to interpret our decision in Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A. (46 N.Y.2d 459) *444 as supportive of its stance, continues to contend that section 3-405 of the Uniform Commercial Code will not absolve a banking institution, be it a depositary, drawee or collecting bank, from liability for its own negligence.
For the ensuing reasons, we believe that, under the circumstances of this case, Chemical's motion for partial summary judgment should have been granted.
Our analysis may well begin with the observation that section 3-405 (subd [1], par [c]) bespeaks an exception to the general rule governing the responsibility of a bank to its customers. For it is basic that ordinarily a drawee bank may not debit its customer's account when it pays a check over a forged indorsement. This is because the underlying relationship between a bank and its depositor is the contractual one of debtor and creditor (Brigham v McCabe, 20 N.Y.2d 525), implicit in which is the understanding that the bank will pay out its customer's funds only in accordance with the latter's instructions (Tonelli v Chase Manhattan Bank, N.A., 41 N.Y.2d 667, 670). Thus, absent contrary instruction or legislative exception, when a drawer issues a check in the name of a particular payee, the drawee bank is to apply funds from the drawer's account to its payment only upon receiving the payee's authorized indorsement. In this perspective, a forged indorsement, since it is an unauthorized signature (Uniform Commercial Code, § 1-201, subd [43]), in and by itself would be "wholly inoperative" (Uniform Commercial Code, § 3-404, subd [1]).
It follows that, in the typical case in which payment is made on a check that is not properly payable (see Uniform Commercial Code, § 4-401, subd [1]), the payment is deemed to have been made solely from the funds of the drawee bank rather than from those of its depositor. But, when the conditions which section 3-405 contemplates prevail, the indorsement, though forged, is still effective, and the instrument then must be treated as "both a valuable instrument and a valid instruction to the drawee to honor the check and debit the drawer's account accordingly" (Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A., supra, at p 465).
*445 This departure from the general rule is explained by section 3-405's Official Comment 4, which advises, "The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee".
Since the assumptions instinct in this rationalization are hardly indisputable, it is no surprise that the rule it supports represents a conscious choice between the traditional one, which, as we have seen, was more protective of the bank's customer, and the one in the code, which, as some commentators have bluntly acknowledged, was "a banker's provision intended to narrow the liability of banks and broaden the responsibility of their customers" (White & Summers, Uniform Commercial Code, § 16-8, p 639). Thus, whatever, in the abstract, may have been the equities of the respective contentions of the competing commercial camps, there can be little doubt but that the outcome, so far as the adoption of section 3-405 of the Uniform Commercial Code is concerned, was calculated to shift the balance in favor of the bank "in situations in which the drawer's own employee has perpetrated the fraud or committed the crime giving rise to the loss" (1 Hawkland, A Transactional Guide to the Uniform Commercial Code, pp 391-394).
That this represents contemporary legislative thinking is clear from the way in which the statutory scheme evolved. Long before section 3-405 of the Uniform Commercial Code came into being, subdivision 3 of section 28 of the former Negotiable Instruments Law already provided that a check is "payable to bearer * * * [w]hen it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable". Carrying this language to its logical limits, one then might have thought that, because an instrument *446 forged by an employee was to be treated as bearer paper, the fact of forgery had been rendered irrelevant to its negotiability.
Nevertheless, most courts, reluctant to read the statute this broadly, applied it only when the faithless employee made or drew the check himself, but not, as in the case before us now, when he had merely furnished the payee's name to the employer, for then the falsity presumably would not be "known to the person making it so payable" (Hawkland, op. cit.). This narrow interpretation apparently fell short of the drafters' intention because the reaction, first, in 1960, was to amend section 28 of the Negotiable Instruments Law to make it explicit that knowledge to the malefactor who furnished the name was sufficient (Britton, Handbook of the Law of Bills and Notes, § 149, pp 433-437). And, secondly, by the adoption of section 3-405 of the Uniform Commercial Code, the bearer fiction device was replaced by the more forthright effective indorsement concept (see Official Comment 1 to § 3-405, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 3-405, NY Anns [1] [b], [c], p 258).
The special scrutiny this legislative course demanded also highlights the fact that section 3-405's failure to delineate a standard of care, to which a bank itself must adhere if it is to advantage itself of this section, was no oversight. In contrast are sections 3-406 and 4-406 of the Uniform Commercial Code, which, along with section 3-405's "padded payroll" provision, deal with defenses which may be available to a drawee bank in forged indorsement cases.
For instance, subdivision (2) of section 4-406, which otherwise precludes a customer from asserting a claim which might have been averted but for its neglect in examining "the [bank] statement and items to discover his unauthorized signature or any alteration on an item" (subd [1]), makes preclusion inapropos when "the customer establishes lack of ordinary care on the part of the bank in paying the item" (subd [3]). And, similarly, section 3-406, which puts the onus for a forgery on a customer who "substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature", *447 still requires the bank to have paid the instrument "in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business".
It is fair to conclude, therefore, that, unlike cases which fall within the foregoing sections, a drawee bank's mere failure to use ordinary care in the handling of a check whose forgery has brought it within the embrace of section 3-405 (subd [1], par [c]) will not subject it to liability (White & Summers, Uniform Commercial Code, § 16-8, p 639).[3]
This is not to say that, if a check is "tainted in some other way which would put the drawee on notice, and which would make its payment unauthorized" (Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A., 46 N.Y.2d 459, 466, supra; emphasis supplied), a drawee bank may yet not be liable. For instance, a drawee bank surely is not immunized by section 3-405 when it acts dishonestly. In short, "a basis for liability independent of any liability which might be created by payment over a forged instrument alone" may very well survive (Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A., supra, at p 469; emphasis supplied).
In contrast, without more, in the present case, it is at once clear that the irregularities on which Merrill Lynch here focuses were part and parcel of the forgeries themselves and, as the dissenters at the Appellate Division observed, "could not possibly have alerted the bank to the fact that the checks were tainted, indeed it would have been most remarkable if the drawee bank had even noticed them". (82 AD2d 772, 774, supra.)
Finally, Merrill Lynch's reliance on Underpinning is misplaced. The checks there, unlike the ones here, contained restrictive indorsements, e.g., "for deposit only", by which the maker explicitly limited deposit to the restrictive indorsers' accounts alone, failure to conform to which *448 would create an independent cause for liability. Indeed in Underpinning, we are not called upon to resolve the liability of a drawee bank, but that of a depositary bank which, as the first to take the checks with the restrictive indorsements, could most readily have prevented the fraud (Uniform Commercial Code, § 3-206, subd [2]; see, generally, Whalley, Forged Instruments and the UCC's "Holder", 6 Ind L Rev 45, 50). Significantly, even there, we pointed out that the forgeries and disregard of the restrictions were distinct defects, one not justifying the other. Obviously, then, Underpinning and the present case are not akin.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and defendant Chemical's motion for partial summary judgment granted. The certified question should be answered in the negative.
Chief Judge COOKE. (concurring).
To permit a drawee bank to avoid liability for paying a check on a forged indorsement by asserting the "fictitious payee" rule, when the bank itself may have acted negligently in paying the check, is a harsh result. Inasmuch as section 3-405 of the Uniform Commercial Code does not include any requirement that a bank act with ordinary care, however, I am constrained to concur in the majority's result.
As a general rule, a forged indorsement is wholly inoperative and ineffective to negotiate an instrument (see Uniform Commercial Code, § 3-404, subd [1]). Consequently, the item is not properly payable and the drawer's account may not be charged (see Uniform Commercial Code, § 4-401, subd [1]; Harbus, The Great Pretender  A Look at the Impostor Provision of the Uniform Commercial Code, 47 U Cin L Rev 385, 387).
In two instances, the general rule is limited when the drawer has acted negligently, and the drawee has not. The drawer may be charged if its negligence has substantially contributed to the making of the unauthorized signature and the drawee has paid the instrument in good faith and in accordance with reasonable commercial standards (see Uniform Commercial Code, § 3-406). Similarly, the drawee is protected if it has acted reasonably and the drawer fails *449 to discover the wrongful payments by not examining its bank statement with reasonable care and promptness (see Uniform Commercial Code, § 4-406).
Another exception to the general rule is created by section 3-405. That statute, at issue here, provides that an indorsement by any person is effective when the check is issued to an imposter or when the named payee was not actually intended to have any interest in the item (see Uniform Commercial Code, § 3-405, subd [1]). Unlike sections 3-406 and 4-406, however, section 3-405 does not prescribe any standard to be applied to a drawee's conduct.
Questions have been raised as to the scope of section 3-405. It is unsettled whether it validates certain signatures for all purposes or only for the limited purpose of permitting negotiability (see Harbus, op. cit., at pp 390-394; Comment, The Effect of Bank Misconduct on the Operation of the Padded Payroll Preclusion of U.C.C. § 3-405, 27 UCLA L Rev 147, 160-161). Thus, it has been suggested that the warranty provisions of section 3-417 should apply (see Harbus, op. cit., at pp 390-393) and that a transferee should be denied holder-in-due-course status when an irregularity on the item's face gives notice of some defect in the instrument (see Comment, op. cit., at pp 165-170).
The central rationale of section 3-405 is that an employer is in the best position to institute controls to guard against employees' fraudulently obtaining checks and so should bear the loss when this occurs (see Uniform Commercial Code, § 3-405, Official Comment 4). The soundness of the reasoning of this conceded "`banker's provision'" (p 445) has been questioned by this court (see Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A., 46 N.Y.2d 459, 468) and commentators (see Harbus, op. cit.; Comment, op. cit.). Its particular hardship becomes clearer when the drawee bank is itself negligent. In a padded payroll situation such as here, the drawer may well not be negligent at all, but rather is the victim of an employee's criminal act (see Harbus, op. cit., at p 409). Yet, the negligent bank, which in other situations may be held liable notwithstanding the drawer's negligence (see Uniform Commercial Code, §§ 3-406, 4-406), will be totally exonerated regardless of its own carelessness because the *450 drawer was duped by an employee (see Harbus, op. cit.). "Th[e] principle [of Comment 4] exemplifies a reasonable commercial policy if all parties are innocent; it seems quite unfair if the bank has not acted in a commercially reasonable manner. It allows a negligent party to escape from the ordinary consequences of its negligence." (Harbus, op. cit., at p 409.) The "rules of 3-405 [should be considered] to be first cousins of the rules in 3-406 and 4-406, and * * * a customer [should be allowed] to prove a drawee's negligence and, having proved it, to assert the forged indorsement." (White & Summers, Uniform Commercial Code [2d ed], § 16-8, p 639.)
Plaintiff here is not attempting to controvert directly the effectiveness of the forged corporate indorsements for negotiating the items. Rather, it argues that the appearance of the indorsements was such as to put defendant on notice of the checks' irregularity. To subsume this issue within that of the effectiveness of the indorsements (see p 447) condones cashing checks with dubious indorsements (cf. Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A., supra, at p 468 ["the drawer is thus precluded from recovering solely on the basis of the forgery from banks which honor the check" (emphasis added)]).
There is no sound reason why a drawee should be absolved of all duty to exercise reasonable care merely because a check was obtained by a drawer's defrauding employee. The large volume of daily business cannot explain this, inasmuch as the burden is placed on the drawee in other situations. Nor is consistency among the States a compelling reason. Two courts in this State have held that a drawee must exercise reasonable care before obtaining the protection of section 3-405 (see Titan Air Conditioning Corp. v Chase Manhattan Bank, N.A., 61 AD2d 764; Board of Higher Educ. v Bankers Trust Co., 86 Misc 2d 560), as have courts in at least two other States (see Wright v Bank of Cal. Nat. Assn., 276 Cal App 2d 485; Pacific Ind. Co. v Security First Nat. Bank, 248 Cal App 2d 75; Frost Nat. Bank of San Antonio v Nicholas & Barrera, 500 SW2d 906 [Tex]).
Unless displaced by the provisions of the Uniform Commercial Code, traditional principles of law and equity are *451 expressly reserved (see Uniform Commercial Code, § 1-103). On the record before this court, it cannot be said that, as a matter of law, checks bearing handwritten, often illegible, corporate indorsements in blank with third-party indorsements of unrelated persons or entities in States far removed from the payees' addresses are not such as would give notice of the item's irregularity to the drawee. This is especially true of those checks that were deposited later than the 60-day limitation printed on their fronts. Certainly, this is not a question to be resolved by Judges on a motion for summary judgment, but one that should be left to the trial court.
Construing section 3-405 in the same manner as sections 3-406 and 4-406 would not shift the loss on all impostor/fictitious-payee checks to the drawee. Section 3-405 should be recognized as the exception it is, however, and applied narrowly (see White & Summers, op. cit.). When the indorsement is in a form that would not arouse suspicion, it would be effective to negotiate the check. If, however, the form of the impostor's or fictitious payee's indorsement is such that, under any other circumstances, it would raise a question as to the item's validity or regularity, the drawee's conduct would be scrutinized and, if found to be negligent, the drawee charged with the forged indorsement.
Having said all this, I must join the majority in reversing the order of the Appellate Division. The absence of a standard of care in section 3-405 must be deemed an intentional omission by the Legislature in light of its ability to include such language when it desires, as manifested by sections 3-406 and 4-406. This court should not require ordinary care by the drawee when the Legislature has declined to do so (see Matter of Carmelo E., 57 N.Y.2d 431; Reigert Apts. Corp. v Planning Bd. of Town of Clarkstown, 57 N.Y.2d 206; Holt v County of Tioga, 56 N.Y.2d 414, 424-425 [COOKE, Ch. J., dissenting]). Instead, section 3-405 should be amended to preclude its invocation by a drawee or other transferee who has failed to exercise due care (see Harbus, op. cit., at p 415).
Order, insofar as appealed from, reversed, with costs, and defendant's motion for partial summary judgment granted. Question certified answered in the negative.
NOTES
[1] As part of the first cause of action, it was also alleged that "the checks were each paid more than six months after their date of issuance, despite the notation on their face `Not to be cashed later than 60 days from the date of this check'."
[2] The appeal is here, pursuant to CPLR 5602 (subd [b], par 1), by leave of the Appellate Division, which certified the following question: "Was the order of this Court, which modified the order of the Supreme Court, properly made?"
[3] Because of the manifest advantages of uniformity in the law of bills and notes, we observe that other courts which have considered the matter have arrived at the same conclusion (see, e.g., Prudential Ins. Co. of Amer. v Marine Nat. Exch. Bank of Milwaukee, 371 F Supp 1002; Kraftsman Container Corp. v United Counties Trust Co., 169 NJ Super 488; Fair Park Nat. Bank v Southwestern Inv. Co., 541 SW2d 266 [Tex]; General Acc. Fire & Life Assur. Corp. v Citizens Fid. Bank & Trust Co., 519 SW2d 817 [Ky]; Western Cas. & Sur. Co. v Citizens Bank of Las Cruces, 33 UCC Rep 1018).