OPINION OF THE COURT
Kaye, J.
 For more than two years, a massive fraud went undetected within Prudential-Bache, involving the issuance of firm checks that were regular on their face but improperly made payable to fictitious customers actually under the control of a Prudential-Bache employee. This case is an attempt by Prudential-Bache to recoup a portion of its losses from defendant, Citibank, one of the banks through which the employee laundered the proceeds of those checks. On Citibank’s motion to dismiss the complaint, we conclude that no cause of action has been stated for conversion or money had and received, but that plaintiff has sufficiently pleaded a cause of action for "commercial bad faith” against the bank. We therefore modify the Appellate Division order that dismissed the entire action.
For purposes of this pleading motion, we accept as true the facts recited in plaintiff’s complaint and other submissions. Beginning about the summer of 1981, John Filer, former section manager of Prudential-Bache’s Dividend Department (which made dividend payments to record owners of securities held by the firm) caused the issuance of Prudential-Bache checks drawn on its account at Banker’s Trust Company, and made payable to companies that were not actual PrudentialBache customers but had names like them. Filer apparently accomplished this by creating false records, misinforming *267 coemployees that proper claims had been presented, himself both requisitioning and approving the checks, and violating other Prudential-Bache procedures. For approximately two years, the checks were processed through Bank Leumi and then, beginning in May 1983, through defendant Citibank. Efler succeeded in embezzling approximately $18.9 million before the scheme was uncovered in October 1983. In two separate actions, Prudential-Bache has sought to recover its losses from the banks. At issue in this case is the approximately $3.7 million channeled through Citibank (see also, Prudential-Bache Sec. v Bank Leumi, Sup Ct, NY County, May 20, 1985 [Wallach, J.], affd without opn 125 AD2d 1016).
Between May and September 1983 — the final months of the fraud — Efler induced Prudential-Bache to issue checks to M.N. Corporation and Harvard Corporation. M.N. and Harvard were not actual Prudential-Bache customers entitled to the dividends requisitioned for them by Efler, but shell corporations set up and controlled by Efler and his coconspirator, Lawrence Artese. Artese, not a Prudential-Bache employee, opened and maintained the accounts in the names of M.N. and Harvard at Citibank’s Hudson Street branch for the purpose of depositing the checks and laundering the proceeds through them. To effect the scheme, the conspirators bribed two Citibank employees, Robert Hutchinson, an assistant manager, and Juanita Reyes, a customer service representative. Hutchinson was paid $65,000 in bribes and Reyes approximately $100,000, in return for which they set up the checking accounts at Citibank without proper opening account records and corporate resolutions, and with fictitious corporate officers; they further agreed not to prepare currency transaction reports, which must be filed with the Internal Revenue Service for cash transactions in excess of $10,000 (see, 31 USC § 5311 et seq.; 31 CFR 103.22 [a]).
Once the accounts were activated at Citibank’s Hudson Street branch, Artese began a pattern of laundering funds there. Within the span of a few months at the branch, he personally moved more than $3.7 million in Prudential-Bache checks into the accounts and removed the funds in cash. Between May and September 1983, Artese deposited about $2.3 million to the account of M.N. and $1.4 million to the account of Harvard, and as soon as the checks cleared he drew out the funds. In all, Artese wrote some 100 checks, payable to cash, payroll or a nominal payee, often cashing several checks on a single day and leaving the branch with large quantities *268 of currency or cashiers’ checks. More than 20 of the checks were in amounts of $10,000 or just under (called "niners” because they skirted the requirement of currency transaction reports), and 40 or more were for larger amounts, some even exceeding $50,000; no currency transaction reports were prepared. Prudential-Bache asserts that other Citibank employees, including managers, were aware of these activities, through conversations with Artese on his near-daily visits to the branch and through cash distributions at teller windows.
In October 1983, Efler’s supervisor conducted a review of account records and the scheme was exposed. PrudentialBache testimony in another action, made part of the record before us, indicated that this review was precipitated by a tip, and that no internal audit of the Dividend Department had been conducted during the entire period of the fraud. On pleas of guilty, Hutchinson and Reyes were convicted in Federal court of conspiring to make false entries on the books of Citibank with intent to injure and defraud Citibank, conspiring to defraud Citibank of their loyal and honest services as its employees through the payment of bribes, conspiring to cause the bank to fail to file currency transaction reports, and making false entries on the books of Citibank with intent to injure and defraud Citibank.
Prudential-Bache thereafter commenced the present action against Citibank, asserting claims of conversion, money had and received, and commercial bad faith, based on the bank’s alleged facilitation of the scheme by enabling the conspirators to launder the proceeds. Citibank denied the material allegations of the complaint and asserted various affirmative defenses as well as three counterclaims. After submissions in which Prudential-Bache and Citibank each accused the other of gross supervisory failures and superior ability to thwart the scheme, Supreme Court granted both plaintiffs motion to dismiss the counterclaims and defendant’s cross motion to dismiss or for summary judgment.
Supreme Court concluded that Prudential-Bache’s complaint should be dismissed because the claims were barred by UCC 3-405 (1) (c) and the common-law causes of action were insufficient in law. With respect to Prudential-Bache’s cause of action sounding in "commercial bad faith,” the court found that Citibank could not be held liable for the wrongdoing of Hutchinson and Reyes, because they were "adverse agents,” as a matter of law; other Citibank employees would either be *269 adverse agents as a matter of law if they participated with Hutchinson and Reyes, or merely negligent if they did not participate — in either event, not subjecting the bank to liability. A divided Appellate Division affirmed for the reasons stated by Supreme Court (141 AD2d 353).* On PrudentialBache’s appeal, we now modify the Appellate Division order by restoring the cause of action for "commercial bad faith,” and otherwise affirm.
Uniform Commercial Code § 3-405
We first consider UCC 3-405 (1) (c), which was a basis for dismissal of the complaint.
The Uniform Commercial Code, in its rules governing check fraud, assigns losses by the relative responsibility of the parties for the loss. Losses arising out of forged indorsements are allocated to the party best able to take precautions to prevent them (see generally, McDonnell, Bank Liability for Fraudulent Checks: The Clash of the Utilitarian and Paternalist Creeds Under the Uniform Commercial Code, 73 Geo LJ 1399 [1985]; Comment, Allocation of Losses from Check Forgeries Under the Law of Negotiable Instruments and the Uniform Commercial Code, 62 Yale LJ 417 [1953]).
Ordinarily, an unauthorized indorsement — that is, either a forged indorsement or one made by an agent exceeding authority (UCC 1-201 [43]) — is ineffective to pass title or authorize the drawee bank to pay (see, 1 White & Summers, Uniform Commercial Code § 16-4, at 793 [Practitioner’s — 3d ed]). The check is not properly payable because an unauthorized signature is inoperative as that of the person whose name is signed (UCC 3-404; see also, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, 57 NY2d 439, 444-445; Tonelli v Chase Manhattan Bank, 41 NY2d 667, 669-670). Consequently, the drawee bank generally may not debit the drawer’s account when it pays such a check. A drawee can, however, shift its loss to prior indorsers by way of an action for breach of warranty of good title (see, UCC 3-417, 4-207), with the loss ultimately placed on the forger or the party taking from the forger — that party being best positioned to identify the transferor as a wrongdoer, protect its own interests, and prevent *270 the fraud (see, Underpinning & Found. Constructors v Chase Manhattan Bank, 46 NY2d 459, 468).
UCC 3-405 (1) (c) creates an exception to the general principle that a drawer is not liable on an unauthorized indorsement. Known as the "fictitious payee” or "padded payroll” rule, UCC 3-405 (1) (c) provides that an "indorsement by any person in the name of a named payee is effective if * * * an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.” Thus, in the very particular factual circumstances described by UCC 3-405 (1) (c), the indorsement is treated as effective even though it is technically unauthorized, and the loss is allocated to the drawer-employer. (See generally, 1 White & Summers, op. cit., § 16-4; Triantis, Allocation of Losses From Forged Indorsements on Checks and the Application of § 3-405 of the Uniform Commercial Code, 39 Okla L Rev 669 [1986]; Comment, The Effect of Bank Misconduct on the Operation of the Padded Payroll Preclusion of U.C.C. § 3-405, 27 UCLA L Rev 147 [1979].)
UCC 3-405 (1) (c) expresses a fundamental public policy determination. As explicated in the Comment, the principle embodied by UCC 3-405 (1) (c) is that losses arising in the specific manner described by the statute are more business risks than banking risks. "[T]he employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.” (UCC 3-405, Comment 4; Farnsworth, Insurance Against Check Forgery, 60 Colum L Rev 284 [I960].)
These assumptions evidence the degree to which the section was calculated by the Legislature "to shift the balance in favor of the bank 'in situations in which the drawer’s own employee has perpetrated the fraud or committed the crime giving rise to the loss.’ ” (Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, 57 NY2d 439, 445, supra [quoting 1 Hawkland, A Transactional Guide to the Uniform Commercial Code, at 391-394].) As has been widely acknowledged, UCC 3-405 is "a banker’s provision intended to narrow the liability of banks and broaden the responsibility of their customers.” (1 White & Summers, op. cit., § 16-5, at 804; see also, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, supra; Stinn *271 Chevrolet v National City Bank, 28 Ohio St 3d 221, 503 NE2d 524, 532; General Acc. Fire & Life Assur. Corp. v Citizens Fid. Bank & Trust Co., 519 SW2d 817, 819 [Ky].)
The facts of this case fit comfortably within UCC 3-405 (1) (c). It is undisputed that an "employee” (Efler) supplied the "maker or drawer” (Prudential-Bache) with the name of a "payee” (M.N. and Harvard). The payees, who were fictitious customers not entitled to the dividend payments, were intended "to have no such interest” in the instruments issued (UCC 3-405 [1] [c]; see also, UCC 3-405, Comment 3 [c], [e]). Contrary to plaintiffs assertion, the subsection is not limited to forged indorsements; it plainly covers situations, as here, where "an employee starts the wheels of normal business procedure in motion to produce a check for a non-authorized transaction.” (New Amsterdam Cas. Co. v First Pa. Banking & Trust Co., 451 F2d 892, 897 [3d Cir]; Continental Bank v WaHo Truck Brokerage, 122 Ariz 414, 421, 595 P2d 206, 213 [Ct App].) Moreover, the practical, policy considerations that motivated UCC 3-405 (1) (c) are evident in the facts of this case. There was no indebtedness from Prudential-Bache to M.N. or Harvard when the firm issued checks naming those entities as payees. As is plain simply from the chronology of undisputed facts, Prudential-Bache was in a position to prevent the massive losses in issue here, by supervising its employees, enforcing its rules and examining records relating to a fraud that had been in progress for nearly two years. Under UCC 3-405 (1) (c), the loss occasioned by Efler’s wrongdoing should thus fall to plaintiff, not Citibank.
In an effort to avoid this result, Prudential-Bache advances two contentions: first, that the Code defense is inapplicable in this action at common law and second, that a standard of care for banks should be read into UCC 3-405 (1) (c) and Citibank failed to meet it. Each will be considered in turn.
The Relationship of UCC 3-405 to Plaintiff’s Claims
Prudential-Bache contends that its complaint states viable common-law causes of action, which persist outside the UCC. As to Prudential-Bache’s claims for conversion and money had and received, we agree with Supreme Court and the Appellate Division that Prudential-Bache cannot sidestep the Code in this fashion, and these claims must be dismissed as insufficient in law. The cause of action for "commercial bad faith” will be treated separately.
*272 As plaintiff concedes, the common-law rule in this State before enactment of the Code was that a drawer had no direct action against a depositary bank; its remedy was against the drawee bank (see, Trojan Publ. Corp. v Manufacturers Trust Co., 298 NY 771). The Code itself did not change the rule, and indeed added defenses that make it even more difficult for a drawer to recover against a depositary bank (see, e.g., UCC 3-405, 3-419 [3]; 3-406, 4-406; see also, Hillman, McDonnell and Nickles, Common Law and Equity Under the Uniform Commercial Code If 14.01 [3]).
Prudential-Bache, however, points to Underpinning & Found. Constructors v Chase Manhattan Bank (46 NY2d 459, supra) as support for its contention that a drawer can maintain a direct action against a depositary bank outside the Code. In Underpinning, a faithless employee forged indorsements on his employer’s checks by using stamps similar to those used by the payees. The indorsements specified that they were "for deposit only,” but the banks permitted the forger to cash some of the checks and deposit others in his own accounts. On discovery of the fraud, the employer sought recovery from the depositary banks. We denied the banks’ motions to dismiss the complaint, recognizing that the employer could maintain an action against the depositary banks for conversion and money had and received, because the banks had committed a gross violation of banking practice by paying out funds in violation of a restrictive indorsement. But we made clear that the exception to the common-law prohibition was a narrow one, noting that had the embezzler indorsed the check in blank, the employer-drawer could not have sued the depositary banks. It was only the restrictive indorsement that shifted liability to the depositary banks, because it placed the banks in a better position to avoid the loss caused by the forgery (id.) at 468-469; see also, Spielman v Manufacturers Hanover Trust Co., 60 NY2d 221, 224-228; Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, 57 NY2d, at 447-448, supra).
Thus, contrary to Prudential-Bache’s assertion, Underpinning is inapplicable here. The checks drawn by PrudentialBache to M.N. and Harvard were deposited in full compliance with the drawer’s instructions. Underpinning does not permit Prudential-Bache to maintain an action against Citibank for conversion or money had and received.
Furthermore, to permit resort to such common-law claims *273 in instances where the Code unmistakably precludes recovery would be to contradict and effectively nullify 3-405 (1) (c). "It is inconceivable that those who drafted the UCC intended to forbid recovery under the Code, but to permit the same remedy for the same wrong outside the Code. Section 1-103 intended the common law to supplement, not contradict, the other provisions of the UCC.” (Consolidated Pub. Water Supply Dist. v Farmers Bank, 686 SW2d 844, 853 [Mo Ct App] [citing Western Cas. & Sur. Co. v Citizens Bank, 676 F2d 1344, 1347-1348 (10th Cir)]; see also, Stone & Webster Eng’g Corp. v First Natl. Bank & Trust Co., 345 Mass 1, 184 NE2d 358.)
We therefore conclude that UCC 3-405 (1) (c) cannot be circumvented by claims for conversion and money had and received. Given this conclusion, we need not and do not reach Citibank’s alternative arguments that UCC 3-406 and 3-419 provide independent grounds for dismissal of these claims.
Standard of Care Required of Depositary Banks
Plaintiff’s cause of action for "commercial bad faith” raises different considerations: what standard of care, if any, is required of banks under UCC 3-405 (1) (c), and does plaintiff’s complaint sufficiently charge Citibank with a failure to meet that standard so as to withstand a motion to dismiss?
True to its characterization as a banker’s provision, UCC 3-405 (1) (c) itself specifies no duty of care. Although the Code elsewhere provides that a drawer can defeat the bank’s defenses to a forgery by showing that the bank did not observe reasonable commercial standards (see, e.g., UCC 3-406, 4-406), no analogous provision was made by the Legislature in UCC 3-405 (1) (c). As we have noted, the history of the subsection demonstrates that the "failure to delineate a standard of care, to which a bank itself must adhere if it is to advantage itself of this section, was no oversight.” (Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, 57 NY2d 439, 446, supra.) While the Legislature might have opted for a statutory standard that apportioned liability according to each party’s actual fault in a particular transaction — as it did elsewhere in the Code — it chose instead in UCC 3-405 (1) (c), as a policy matter, to allocate the loss to the drawer-employer because it perceived that party was in a better position to prevent such loss from occurring in the first instance.
In Merrill Lynch, we recognized that a bank’s negligence is irrelevant under UCC 3-405 (1) (c). Even though the drawer- *274 employer may itself be blameless, the bank’s failure to use ordinary care in handling a check within the purview of UCC 3-405 (1) (c) will not subject a bank to liability. Indeed, a pointed plea for statutory reform to preclude invocation of UCC 3-405 (1) (c) by transferees who failed to exercise due care evoked no response from the Legislature (see, 57 NY2d, at 451 [Cooke, Ch. J., concurring]). Plaintiff urges, however, that an action lies outside the Code for "commercial bad faith”, and it supports this contention by reliance on Brighton, Inc. v Colonial First Natl. Bank (176 NJ Super 101, 422 A2d 433), affirmed by the New Jersey Supreme Court "substantially for the reasons” expressed by the lower court (86 NJ 259, 430 A2d 902).
In Brighton, a faithless employee repeatedly cashed checks over the forged indorsements of numerous payees; the employee himself was neither payee nor indorsee, but apparently was able to procure large amounts of cash at one depositary bank even without identification. While the opinion does not set forth just how this was accomplished, the courts’ writings paint the bank’s behavior as egregious and outrageous dereliction (86 NJ, at 261-263, 430 A2d, at 904 [Handler, J., concurring in part, dissenting in part]; 176 NJ Super, at 121, 422 A2d, at 443, supra). The drawer’s claims of negligence, conversion, and money had and received were rejected, as barred by UCC 3-405 (1) (c). However, the court allowed the drawer to maintain its claim against a depositary bank "for a cause of action sounding in conspiracy or actual fraud by the principals of that bank in alleged confederation with [the wrongdoer]. ” (176 NJ Super, at 121, 422 A2d, at 443 [emphasis added], supra.) The court emphasized that the surviving cause of action hinged on the bank’s actual complicity and deliberate conspiracy to inflict such losses, which conduct falls outside Code concerns. The concurring opinion of a single Justice of the New Jersey Supreme Court, advocating an extra-Code cause of action for reckless and wanton bank conduct, underscores the narrowness of the surviving cause of action that was recognized by the full court in that case (86 NJ, at 260, 430 A2d, at 904 [Handler, J., concurring in part, dissenting in part]).
There is nothing novel in the proposition that a depositary bank cannot use UCC 3-405 (1) (c) to shield its own out-and-out dishonesty. In Merrill Lynch, we noted that "a drawee bank surely is not immunized by section 3-405 when it acts dishonestly.” (57 NY2d 439, 447, supra; see also, Underpinning & *275 Found. Constructors v Chase Manhattan Bank, 46 NY2d 459, 466, supra.) Other courts have concluded that a depositary bank cannot rely on UCC 3-405 as a defense against a drawer where the bank acts dishonestly (see, e.g., Hicks-Costarino Co. v Pinto, 23 UCC Rep Serv 680, NYLJ, Feb. 23, 1978, at 13, col 3 [Kunzeman, J.]; British Caledonian Airways v First State Bank, 819 F2d 593 [5th Cir]; Western Cas. & Sur. v Citizens Bank, 676 F2d 1344 [10th Cir], supra; General Acc. Fire & Life Assur. Corp. v Citizens Fid. Bank & Trust Co., 519 SW2d 817 [Ky], supra; City of Phoenix v Great W. Bank & Trust, 148 Ariz 53, 712 P2d 966 [Ct App]; Prudential Ins. Co. v Marine Natl. Exch. Bank, 371 F Supp 1002 [ED Wis]). Where a depositary bank acts dishonestly — where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme — such conduct falls wholly outside the allocation of business risks that was contemplated by UCC 3-405 (1) (c). (See, UCC 1-203, 3-405, Comment 4; Triantis, op. cit., 39 Okla L Rev, at 683.)
The question at hand is whether Prudential-Bache’s complaint alleges such a cause of action against Citibank. It bears emphasis that we answer this question in the context of a motion to dismiss the complaint, where courts are obliged to view plaintiff’s assertions most favorably because the motion would terminate the action before there has been any opportunity for discovery. A court therefore must assume the truth of the facts asserted in the complaint and the affidavits opposing dismissal (see, Credit Alliance Corp. v Andersen & Co., 65 NY2d 536, 541, n 1; Rovello v Orofino Realty Co., 40 NY2d 633), and accord plaintiff the benefit of all favorable inferences that may be drawn from its pleadings (see, CPC Intl. v McKesson Corp., 70 NY2d 268, 284-285; Underpinning & Found. Constructors v Chase Manhattan Bank, supra, at 462). Applying these standards to plaintiff’s contentions, we conclude that a cause of action has been stated.
Plaintiff’s cause of action for "commercial bad faith” rests on allegations that Citibank, through its officers, agents and employees, actually knew of and thereby itself became a participant in the unlawful scheme to launder plaintiff’s funds. Citibank vigorously protests its liability for the criminal conduct of its employees Hutchinson and Reyes, branding them "adverse agents” as a matter of law, and insists that any other bank officers, agents or employees who knew of the scheme would themselves either be adverse agents as a matter of law or merely negligent.
*276 A legal entity, of course, necessarily functions through human actors — its officers, agents and employees — whose knowledge and conduct may be imputed to the entity under the doctrine of respondeat superior (see, e.g., Riviello v Waldron, 47 NY2d 297, 302-303). But an employer may not be held accountable to third persons for the conduct of employees who, while ostensibly acting for their employer, in fact totally abandon the employer’s interests and act entirely for their own or others’ purposes (see, Center v Hampton Affiliates, 66 NY2d 782, 785; Marine Midland Bank v Russo Produce Co., 50 NY2d 31, 43-44; Farr v Newman, 14 NY2d 183, 190-191; Lippes v Atlantic Bank, 69 AD2d 127, 134-135).
Citibank urges that by secretly accepting bribes to open and service the accounts improperly and illegally, Hutchinson and Reyes totally abandoned the object of their employment and acted entirely for their own or others’ purposes, and that neither their wrongful conduct nor their guilty knowledge can be imputed to Citibank. Our acceptance of these contentions as a matter of law is central to the success of this motion. The motion must fail unless this court would declare as a matter of law that any wrongdoing by any Citibank employees was either too adverse for the imputation of fault or too benign for the imposition of liability under UCC 3-405 (1) (c) — as a practical matter foreclosing the cause of action for bad faith we now recognize. At this juncture, on this record, we cannot adopt those conclusions.
What plaintiff has pleaded is not merely a lapse of "wary vigilance” (Hall v Bank of Blasdell, 306 NY 336, 341; Spielman v Manufacturers Hanover Trust Co., 60 NY2d 221, supra), or even "suspicious circumstances which might well have induced a prudent banker to investigate”. (Chemical Bank v Haskell, 51 NY2d 85, 93; see also, British Caledonian Airways v First State Bank, supra, at 597.) Such assertions of bank negligence by a drawer would be insufficient to state a cause of action against a depositary bank. Instead, plaintiff has portrayed an embezzlement scheme of massive dimension accomplished in part through a pattern of money-laundering conducted on a near-daily basis by a single individual, concentrated within a few months, at one bank branch.
Apart from the Federal crimes to which they have pleaded guilty, two Citibank employees allegedly failed to follow bank procedures in preparing proper account records; plaintiff as *277 serts that these employees had conversations with others at the bank about Artese. The alleged activities of Hutchinson and Reyes in this matter have not yet been the subject of discovery by plaintiff, who insists that they were also promoting the bank’s interests and therefore not truly "adverse agents.” We cannot conclude now that any and all misconduct of Hutchinson and Reyes with respect to the laundering scheme was necessarily selfish and antagonistic to their employer, so as to insulate Citibank from any imputation of their wrongdoing. But even if the full dealings of Hutchinson and Reyes with the conspirators were known and determined to meet the "adverse agent” test, plaintiff points to certain Grand Jury testimony and asserts that other managerial employees of the bank knew of and thus participated in the scheme. Additionally, plaintiff argues that, for present purposes, we must infer the participation of other employees from the frequency of Artese’s visits to the branch, his repeated large cash withdrawals at teller windows, and his conversations with other Citibank employees.
There may well prove to be merit in Citibank’s contentions that all involved employees were either adverse agents or at most negligent; indeed, the issues may even be subject to resolution by way of motion, short of trial. Moreover, plaintiff bears a heavy burden to sustain its assertions of bank dishonesty or — to use the Brighton test plaintiff advocates — of complicity by principals of the bank in alleged confederation with the wrongdoers. A showing short of the bank’s bad faith will not suffice to shift the loss from plaintiff, where it has been squarely placed by the Legislature in UCC 3-405 (1) (c). Great though plaintiff’s burden may be, however, its assertions of bad faith are sufficient at this time to withstand dismissal of the complaint.
Accordingly, the order of the Appellate Division should be modified by reinstating plaintiff’s third cause of action and, as so modified, affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order modified by reinstating plaintiff’s third cause of action and, as so modified, affirmed, with costs to plaintiff.

 A motion to dismiss Prudential-Bache’s complaint in its related action against Bank Leumi was denied by the trial court and unanimously affirmed by the Appellate Division (see, Prudential-Bache Sec. v Bank Leumi, Sup Ct, NY County, May 20, 1985 [Wallach, J.], affd without opn 125 AD2d 1016).