OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Ordinarily, the drawer of a check is not liable on a forged indorsement. An exception to this principle is found in Uniform Commercial Code § 3-405 (1) (b) — the "fictitious payee” rule — which allocates the loss to the drawer if "a person signing as or on behalf of a * * * drawer intends the payee to have no interest in the instrument.” In this case of statutory interpretation, we are asked whether the fictitious payee rule, typically applied to protect banks, can also extend to nonbank depositaries when they accept a check over a forged indorsement. We answer that question in the affirmative. We further conclude that the depositary here did not by reason of its own negligence forfeit the benefit of the fictitious payee rule because its conduct did not rise to the level of commercial bad faith, and we therefore dismiss the drawer’s complaint.
 

 Facts
 

 Respondent Getty Petroleum Corporation distributes gasoline through dealer-owned stations. Customers who purchase gasoline at a Getty station can pay by cash or credit card. When a customer uses a credit card, Getty processes the transaction, receives payment from the credit card company and then issues computer-generated checks payable to dealers to reimburse them for their credit card sales. Many of the checks, however, are not intended for negotiation and are never delivered to the payees. Instead, Getty uses these checks for bookkeeping purposes, voiding them and then crediting the check amount toward the dealer’s future purchases of gasoline.
 

 A supervisor in Getty’s credit processing department, Lorna Lewis, was given sole responsibility for voiding the checks. From April 1991 to October 1992, Lewis stole over 130 of the checks, forged the indorsements of the payees by hand or rubber stamp, and then submitted the checks to appellant American Express Travel Related Services Company, Inc. and other credit card companies in payment of her own credit card debt. The credit card companies, in turn, credited Lewis’s accounts
 
 *326
 
 and forwarded the checks through ordinary banking channels. Chemical Bank, where Getty maintained its checking account, honored each of the checks bearing the forged indorsements.
 

 After uncovering Lewis’s theft, Getty commenced an action against the credit card companies which had accepted the checks. As against American Express, Getty sought to recover the face amount of 31 checks, and following a nonjury trial Supreme Court found American Express liable to Getty in the amount of $58,841.60. Supreme Court agreed with American Express that UCC 3-405 is applicable to nonbank transferees and that, because the stolen checks were drawn by Getty with the intent to be voided, and not delivered to the individual dealers, the checks fell within the scope of the statute. Nevertheless, the court concluded that in light of American Express’s remittance procedures "calculated to make forged, fraudulent and stolen checks acceptable for processing” and its acceptance of stolen checks on which Lewis’s name did not appear, American Express had acted with gross negligence as a matter of law and thus, could not avail itself of the protection of UCC 3-405.
 

 The Appellate Division affirmed, but on different grounds. Contrary to Supreme Court, the Appellate Division held that UCC 3-405 "is widely acknowledged to be a 'bankers provision’, and should not protect non-bank depositaries such as American Express” (227 AD2d 444, 445). In addition, the court held that American Express could not avoid liability since it was not a holder in due course and had exhibited "wilful blindness constituting gross negligence”
 
 (id.,
 
 at 446).
 

 We now reverse and dismiss Getty’s complaint.
 

 Discussion
 

 The provisions of article 3 of the Uniform Commercial Code relating to check fraud have as their purpose ensuring the ready negotiability of commercial paper and advancing the important policy of assigning loss based upon the relative responsibility of the parties
 
 (see, Hartford Acc. & Indem. Co. v American Express Co.,
 
 74 NY2d 153, 165). Article 3 accomplishes these ends by establishing commercially sound rules designed to place the risk of loss attributable to fraud such as forged indorsements with the party best able to prevent them
 
 (Prudential-Bache Sec. v Citibank,
 
 73 NY2d 263, 269;
 
 see generally,
 
 McDonnell,
 
 Bank Liability for Fraudulent Checks: The Clash of the Utilitarian and Paternalist Creeds Under the Uniform Commercial Code,
 
 73 Geo LJ 1399 [1985]).
 

 
 *327
 
 Losses caused by a forged instrument are in the first instance allocated to the drawee bank because, as between that bank and its drawer, the drawee bank is in the better position to detect the forgery before payment
 
 (Spielman v Manufacturers Hanover Trust Co.,
 
 60 NY2d 221, 224;
 
 see, Putnam Rolling Ladder Co. v Manufacturers Hanover Trust Co.,
 
 74 NY2d 340, 345;
 
 Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d 439, 444-445). Consistent with this premise, the Code deems a forged indorsement "wholly inoperative” and upon improper payment by the drawee bank over a forged indorsement, the drawee bank must recredit the drawer’s account (UCC 1-201 [43]; 3-404 [1]; 4-401; 2 White and Summers, Uniform Commercial Code § 18-3, at 213-215 [Practitioner’s 4th ed]).
 

 Article 3, however, shifts the risk of loss to the drawer in situations where the drawer is the party best able to prevent the loss
 
 (see, e.g.,
 
 UCC 3-405, 3-406, 4-406;
 
 see also,
 
 McDonnell,
 
 op. cit.,
 
 73 Geo LJ, at 1407). In particular, UCC 3-405 (1) (b)— the fictitious payee rule — provides that "[a]n indorsement by any person in the name of a named payee is effective if * * * a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument.” The forged indorsement, in other words, is treated as if it were the actual indorsement of the stated payee, and payment by a transferee in the transactional chain is proper
 
 (see, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d at 444,
 
 supra; Underpinning & Found. Constructors v Chase Manhattan Bank,
 
 46 NY2d 459, 464;
 
 see also,
 
 2 Crandall, Herbert and Lawrence, Uniform Commercial Code § 17.12.1, at 17:160 [1996]).
 

 The situation presented here is precisely that contemplated by UCC 3-405 (1) (b). Getty drew more than 4,000 checks to the order of payees with no intention that they would be delivered or negotiated. Rather, it was Getty’s intention to void the checks and use them to create a paper trail of gasoline credits. Of these, over 130 were misappropriated by Lewis, who then forged the indorsement of the dealers. In short, the drawer (Getty) made checks payable to a payee (a dealer), intending the payee to have no interest in the instruments, thus rendering the forged indorsement by Lewis on the checks "effective” (UCC 3-405 [1] [b];
 
 see,
 
 UCC 3-405, Comments 1, 3;
 
 see also, 2
 
 Anderson, Uniform Commercial Code § 3-405:4, at 932 [2d ed]).
 

 As the record demonstrates, Getty was in the best position to prevent the losses by its bookkeeping practices, by supervising
 
 *328
 
 its employees, by enforcing its rules and by examining records relating to a fraud that had been in progress for a considerable time. Under UCC 3-405 (1) (b), the loss brought about by Lewis’s misconduct should therefore fall to her employer, not the depositary
 
 (see,
 
 UCC 3-405, Comment 4;
 
 Hartford Acc. & Indem. Co. v American Express Co.,
 
 74 NY2d at 165,
 
 supra
 
 [the purpose of the UCC is to ensure that check transferees "need not stand as insurers of the honesty of a drawer corporation’s employees”]).
 

 Getty attempts to sidestep responsibility by advancing two arguments: first, that the fictitious payee rule applies only when the transferee of the forged instrument is a bank and second, that American Express’s own conduct amounted to gross negligence which strips it of the protection of the rule. We reject both contentions.
 

 Rule Not Limited To Banks
 

 Nothing in UCC 3-405 limits the protection of the fictitious payee rule to banks. Comment 4 to UCC 3-405 indicates that the rule was intended to protect all holders of negotiable instruments: "The principle followed [in UCC 3-405] is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee.” Equally significant is that the Code itself , does not distinguish between bank and nonbank holders. The Code defines a "holder” as "a person who is in possession of * * * an instrument * * * indorsed * * * in blank” (UCC 1-201 [20]). Here, American Express was a "holder” because it was the recipient of instruments indorsed in blank by Lewis (UCC 3-202 [1]).
 

 Moreover, the limitation Getty urges upon the Court undermines the objective of the Code to shift the risk of loss to the party best able to prevent loss under circumstances presented by this case — namely, the drawer-employer. As we noted in
 
 Prudential-Bache:
 
 " 'the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or •drawee’ ” (73 NY2d at 270,
 
 supra,
 
 quoting UCC 3-405, Comment 4;
 
 see,
 
 Farnsworth,
 
 Insurance Against Check Forgery,
 
 60 Colum L Rev 284 [I960]).
 

 In rejecting Getty’s argument, we also bear in mind that, had the Legislature intended to limit UCC 3-405 to banks, it
 
 *329
 
 might have done so in the plain language of the statute. The Legislature did exactly that in UCC 3-206 and 3-419, which limit the conversion liability of an "intermediary bank,” or a "payor bank which is not a depositary bank” in specified situations
 
 (see also,
 
 UCC 4-105; 2 White and Summers,
 
 op. cit.,
 
 §§ 16-7,18-4, at 92-100, 222-225). Alternatively, the Legislature might have expressed such a limitation in UCC 3-103 ("Limitations on Scope of Article”). Both UCC 3-405 and 3-103, however, are silent concerning which persons may avail themselves of the protections of the fictitious payee rule. Finally, had the Legislature wanted to limit the scope of article 3 to banks, it would not have included such a broad range of negotiable instruments within its reach, including "draffc[s]” and "note[s],” representing a promise of payment by entities other than banks (UCC 3-103, 3-104).
 

 In support of its argument, Getty relies on this Court’s statement in
 
 Prudential-Bache
 
 that UCC 3-405 is " 'a banker’s provision intended to narrow the liability of banks’ ” (73 NY2d at 270,
 
 supra),
 
 as well as
 
 Stockton v Gristedes Supermarkets
 
 (177 AD2d 425, 426) and
 
 Aetna Cas. & Sur. Co. v Bank of N. Y.
 
 (22 UCC Rep Serv 2d [CBC] 813, 817 [Sup Ct, NY County]). The latter two cases suggested that because banks were the primary architects of UCC 3-405 the provision should protect only banks
 
 (see,
 
 Annotation,
 
 Construction and Effect of "Padded Payroll” Rule of UCC § 3-405,
 
 45 ALR5th 389, 431-432, § 5 [summarizing both cases]).
 

 Getty, however, overstates the import of the description "bankers provision,” which simply recognizes the reality that UCC 3-405 is most often asserted by drawee banks because they are usually the party sued by the drawer for paying over a forged indorsement
 
 (see, e.g., Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d 439,
 
 supra; Tonelli v Chase Manhattan Bank,
 
 41 NY2d 667,
 
 supra; see also, Horovitz v Roadworks of Great Neck,
 
 76 NY2d 975, 976 ["the general rule (is) that a drawer does not have a direct cause of action against a depositary bank for collecting an improperly indorsed check”]; Note,
 
 U.C.C. Section 3-405: Of Imposters, Fictitious Payees, and Padded Payrolls,
 
 47 Fordham L Rev 1083, 1084, n 10 [1979] ["(t)he Code clearly contemplates an action by the drawer against the drawee bank” (citing UCC 4-401)]). A recognition that the benefit of the rule has most often been claimed by banks does not, however, exclude others from the provision.
 

 Getty’s remaining "policy” arguments are similarly unpersuasive. First, application of UCC 3-405 to nonbanks such as
 
 *330
 
 American Express would not in any way obviate any requirement of good faith on the part of American Express: the Code imposes a duty of good faith on all parties. Second, whether banks are in greater need of protection from forged indorsements than others is irrelevant. The objective is to place the loss on the party best able to avoid it, which is the drawer. Third, while the statutory time constraints faced by banks to accept or dishonor checks
 
 (see,
 
 UCC 4-104 [1] [h]; 4-301, 4-302) may help to explain why the fictitious payee rule is especially important to banks, it does not compel confinement of the rule to them.
 

 In sum, we are satisfied that the fictitious payee rule should extend to nonbank depositaries that accept checks over forged indorsements.
 

 No Evidence of Commercial Bad Faith
 

 That conclusion does not end the analysis. Getty claims that even if the fictitious payee rule applies, American Express should be denied the benefit of the rule because of its own gross negligence.
 

 As an initial matter, Getty misstates the exception to UCC 3-405. UCC 3-405 does not require that a transferee demonstrate due care in order to enjoy its protection, unlike other risk-shifting provisions which permit a drawer to defeat a transferee’s defenses by demonstrating the transferee’s failure to observe "reasonable commercial standards” (UCC 3-406) or to use "ordinary care” (UCC 4-406 [3]). Thus, while a drawer can defeat a defense to forgery by showing that the transferee acted negligently under these two sections of the Code, there is no similar qualifying language incorporated in UCC 3-405. In short, UCC 3-405 does not invite courts to balance the relative culpability of the parties
 
 (see, Prudential-Bache Sec. v Citibank,
 
 73 NY2d at 273,
 
 supra).
 

 As we noted in
 
 Prudential-Bache,
 
 while "the Legislature might have opted for a statutory standard that apportioned liability according to each party’s actual fault in a particular transaction — as it did elsewhere in the Code — it. chose instead in UCC 3-405 (1) (c), as a policy matter, to allocate the loss to the drawer-employer because it perceived that party was in a better position to prevent such loss from occurring in the first instance”
 
 (id.,
 
 at 273;
 
 see, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d at 446,
 
 supra
 
 ["section 3-405’s failure to delineate a standard of care, to which a bank
 
 *331
 
 itself must adhere if it is to advantage itself of this section, was no oversight”]). In fact, former Chief Judge Cooke in a concurrence urged the Legislature to consider amending UCC 3-405 to include an exception based on a transferee’s failure to exercise due care, but the Legislature has to this day declined the invitation
 
 (Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d at 451,
 
 supra
 
 [Cooke, Ch. J., concurring];
 
 see also,
 
 2 White and Summers,
 
 op. cit.,
 
 § 19-4, at 262-263 [1990 revisions to UCC 3-405 by American Law Institute and National Conference of Commissioners on Uniform State Laws, not adopted by New York State, include comparative negligence standard similar to that of UCC 3-406]).
 

 Consequently, a transferee’s lapse of wary vigilance, disregard of suspicious circumstances which might have well induced a prudent banker to investigate and other permutations of negligence are not relevant considerations under section 3-405
 
 (see, Prudential-Bache Sec. v Citibank,
 
 73 NY2d at 276, supra;
 
 see, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,
 
 57 NY2d at 447,
 
 supra).
 
 Rather, there is a "commercial bad faith” exception to UCC 3-405, applicable when the transferee "acts dishonestly — where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme”
 
 (Prudential-Bache Sec. v Citibank,
 
 73 NY2d at 275;
 
 see also, Peck v Chase Manhattan Bank,
 
 190 AD2d 547, 548-549;
 
 Touro Coll. v Bank Leumi Trust Co.,
 
 186 AD2d 425, 427). Such a test finds support in the text of the Code, which omits a standard of care requirement from UCC 3-405 but imposes on all parties an obligation to act with "honesty in fact” (UCC 1-201 [19]; 1-203). The legislative history supports this conclusion as well: an early draft of the "good-faith” provision of the Code including a commercial reasonableness standard was rejected in favor of the "honesty in fact” standard ultimately adopted
 
 (see,
 
 Braucher,
 
 The Legislative History of the Uniform Commercial Code,
 
 58 Colum L Rev 798, 812 [1958]).
 

 Getty therefore had the heavy burden of demonstrating that American Express’s conduct amounted to dishonesty or complicity in Lewis’s plans. Both Supreme Court and the Appellate Division found that American Express accepted 31 checks on behalf of Lewis even though neither her name nor the name of American Express appeared on these checks. Those courts also determined that American Express routinely processed stale checks, checks payable to neither American Express nor the customer, checks where neither American Express nor the
 
 *332
 
 customer was listed on the check, checks from unrelated third parties, and multiple checks from multiple third parties with different addresses in different States for a single transaction. Such conduct was surely lamentable, likely even grossly negligent. There is no evidence, however, that American Express had actual knowledge of Lewis’s wrongdoing or was somehow a participant in Lewis’s fraudulent scheme. Getty thus failed to meet its burden of proving commercial bad faith as a matter of law.
 

 Getty’s remaining contentions are without merit.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the complaint dismissed.
 

 Judges Titone, Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 Order reversed, etc.