## UNIVERSAL PREMIUM ACCEPTANCE CORPORATION

v.

## The YORK BANK & TRUST CO.

### Civ. A. No. 94–2138.

United States District Court,
E.D. Pennsylvania,
Civil Division.

Sept. 29, 1994.

Richard P. McElroy, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for plaintiff.

C. Lamar Garren, Piper & Marbury, Philadelphia, PA, for defendant.

## MEMORANDUM

BARTLE, District Judge.

This is a diversity action in which plaintiff, Universal Premium Acceptance Corp. ("UPAC"), has sued defendant, the York Bank & Trust Co. ("York"), regarding York's alleged mishandling of various negotiable instruments issued by UPAC. Before the court are the parties' cross-motions for summary judgment. Pennsylvania law is applicable.

The material facts are undisputed. UPAC is in the business of providing financing to third parties to pay insurance policy premiums. In the fall of 1991, Walter Talbot ("Talbot") of the W. Talbot Insurance Agency contacted UPAC. Talbot sought to obtain financing for his clients for premiums they would owe on policies to be issued by Great American Insurance Company ("Great American"). UPAC agreed to provide the financing.

In order that Talbot could process the premium financings, UPAC sent him blank drafts on UPAC's account at Landmark Bank ("Landmark") in St. Louis, Missouri.[1] These forms contained the preprinted language, "PAY AND DEPOSIT ONLY TO THE CREDIT OF: _____ INSURANCE CO." Talbot was to fill in the name of the insurance company and the amount payable.

---

1. Landmark was succeeded by Magna Bank of Missouri at some point after June of 1992. For convenience, this court will refer to UPAC's bank as "Landmark" throughout.

It appears that Talbot was also to sign the draft, as no signature of any UPAC representative appeared on the blank draft forms UPAC had provided.

Between September of 1991 and July of 1992, Talbot filled out and signed more than $1,000,000 in UPAC drafts naming Great American as the payee.[2] These drafts purported to pay the premiums of Talbot's clients for Great American insurance policies. However, these policies did not exist, and Talbot did not deliver the drafts to Great American. Instead, Talbot and a confederate, James Smith ("Smith"), forged the indorsement of Great American on the UPAC drafts Talbot had prepared and deposited them into an account they controlled at York entitled "Small Businessman's Service Corp." The front and back sides of one such draft is reproduced below. [Editor's Note: See Diagrams A and B following this opinion] UPAC eventually recovered some of the misappropriated funds from Talbot and Smith, who are currently serving prison sentences, and seeks to recover the remainder, approximately $700,000, from York.

■ The Uniform Commercial Code ("UCC"), codified in Pennsylvania as 13 Pa. Cons.Stat.Ann. §§ 1101 et seq. (1979),[3] defines a "draft" as a writing signed by the maker or drawer containing an unconditional order to pay. § 3104. A draft is a "check" if it is drawn on a bank and is payable on demand. Id. Although the UPAC instruments are drawn on a bank, Landmark, the parties refer to them as drafts, not checks, apparently because of UPAC's contention that they are not payable on demand.

The parties agree that when a depositary bank such as York presented the UPAC instruments to Landmark for collection, Landmark sought and received UPAC's approval before paying on them. It would appear from the face of the instruments that the named payee could receive payment on demand, however. Section 3108 states that

instruments payable on demand include those "in which no time for payment is stated." No time for payment is stated on those at issue here. Moreover, it is undisputed that York paid on them at the time they were presented. As the issue of whether these instruments are properly deemed "drafts" or "checks" is irrelevant to the decision at hand, this court will employ the terminology used by the parties and refer to them solely as "drafts."

■ Under the UCC, a forged indorsement generally is ineffective to authorize a drawee bank such as Landmark to pay on an instrument. Prudential–Bache Secs., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 539 N.Y.S.2d 699, 702, 536 N.E.2d 1118, 1121 (1989). The forger is liable for losses due to payments resulting from forged indorsements. Ronald Anderson, 6 Uniform Commercial Code, § 3–405:11 (1993). If the forger is unavailable or unable to repay the full amount, the first party taking the instrument from the forger, here, York, suffers the loss. Prudential–Bache, 73 N.Y.2d 263, 539 N.Y.S.2d at 702, 536 N.E.2d at 1121. This rule is predicated on the policy that a party such as York, a depositary bank accepting an instrument from the forger, is generally the one most able to detect the fraud and prevent the loss from occurring. As the parties agree that York paid the drafts as a result of a concededly forged indorsement, UPAC contends that York is liable for the loss. See McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 759 (3d Cir.1990).

■ While not contesting the general rule, York argues that the situation at bar is governed by an exception known as the fictitious or nominal payee rule. This exception states:

(a) General rule.—An indorsement by any person in the name of a named payee is effective if:

.    .    .    .    .

2. The parties agree that on some of these drafts, the named payee is "Great American Accel. Commercial Underwriters." For convenience, this court will refer to the designated payee as "Great American" throughout.

3. All of the transactions at issue in this case took place during 1991 and 1992. Although Pennsylvania adopted the 1990 revisions to the UCC, these revisions did not become effective until July of 1993. Accordingly, the 1979 version of the UCC governs this action.

(2) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument.... § 3405(a). This exception shifts the loss to the drawer. Presumably it does so because, in this situation, the drawer is better able than a bank to prevent the fraud. Here, for instance, UPAC actually provided its blank drafts to the forger. If § 3405(a) applies, York received good title to the draft despite the forged indorsement, and UPAC must bear the loss. *See McAdam*, 896 F.2d at 759–60.

York argues that Talbot was "a person signing as or on behalf of a maker or drawer [who] intend[ed] the payee to have no interest" in the draft. § 3405(a)(2). The parties agree that Talbot, who received the blank drafts from UPAC, did not intend Great American to have an interest in the drafts when he prepared and signed them. UPAC contends, however, that Talbot did not sign the drafts "as or on behalf of" UPAC, the drawer. *Id.*

UPAC bases its argument in large part on the placement of Talbot's signature on the draft beneath the name of the alleged insured and over the preprinted words "Producer of Record/Broker/Agent." See Diagram A at "1." UPAC cites § 3403(c), which states that "[e]xcept as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity." Without citing any supporting precedent, UPAC declares that "Talbot as Producer cannot have authority to sign on behalf of both parties to the transaction, the [insured] and UPAC."

The Pennsylvania Supreme Court held in *Rossi v. Firemen's Insurance Co.* that an agent can act on behalf of two different principals in a transaction when both know of the double agency. 310 Pa. 242, 165 A. 16, 18 (1932); *see also Kairys v. Aetna Cas. & Sur. Co.*, 314 Pa.Super. 502, 461 A.2d 269 (1983); Restatement (Second) of Agency § 392 (1957). UPAC must have known of Talbot's dual status because the premium finance agreement forms UPAC sent to Talbot to prepare indicated that Talbot was "fully and lawfully authorized to sign this agreement by and on behalf of [the insured]." At the same time, UPAC sent Talbot the blank drafts. The transactions could not be consummated and UPAC could not obtain the business and profits it sought unless it had authorized Talbot to sign the drafts on its behalf.

■ Talbot's signature appears on the lower right hand corner of the drafts. See Diagram A at "1." The commentary to § 3402 states that "by long established practice judicially noticed or otherwise established a signature in the lower right hand corner of an instrument indicates an intent to sign as ... the drawer of a draft." UPAC does not dispute the characterization of the drafts as negotiable instruments.[4] To be negotiable, a draft must be signed by or on behalf of the drawer. §§ 3104(a)(1), 3405(a)(2). Talbot's signature on the face of the draft is the only one which could have been made on behalf of UPAC, the drawer.[5]

■ Moreover, whether or not UPAC formally designated Talbot as its "agent" is not dispositive. Section 3405(a)(2) applies to any person signing "on behalf of" the drawer. As noted by the Court of Appeals for the Fifth Circuit, "[n]othing in [§ 3405(a)(2)] limits its application to cases in which the drawer's signature is authorized." *Perini Corp. v. First Nat'l. Bank*, 553 F.2d 398, 409 n. 14 (5th Cir.1977), *reh'g denied*, 557 F.2d 823 (5th Cir.1977).

---

**4.** Since the instruments do not contain the term "order," they may in fact be "non-negotiable instruments." § 3805. Such instruments are treated as if they are negotiable instruments except for holder in due course rules not applicable to this case. *Id.* Even if these instruments are entirely outside the coverage of the UCC, "nothing in [the UCC] is intended to mean that in a particular case involving such a writing a court could not arrive at a result similar to the result that would follow if the writing were a negotiable instrument." Comment 2, 13 Pa.Cons.Stat.Ann. § 3104 (1992). The parties agree that "Article 3 of the Pennsylvania Commercial Code" should be applied to the instruments at issue in this case "despite the fact that [they] are not payable to order or bearer."

**5.** The only other signature on the front of the draft purports to be an acknowledgment on behalf of Great American. See Diagram A at "2."

Even if, as UPAC contends, Talbot was not explicitly authorized to sign the drafts on UPAC's behalf,[6] UPAC ratified Talbot's actions by paying on the drafts. The commentary on § 3404(a) explains that ratification of an unauthorized signature

> may be found from conduct as well as from express statements. Thus it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature; and although the [signer] is not an agent, the ratification is governed by the same rules and principles as if he were.

§ 3404(a), comment 3. UPAC knew that Talbot was completing and signing its drafts because it sent them to him for that very purpose. Thereafter, UPAC paid on drafts completed and signed by Talbot and sought to retain benefits of the business it thought Talbot generated. *See* 6 Anderson, §§ 3–404:27 to 3–404:38. UPAC admits that it could have stopped its bank from paying on the drafts if it had chosen to do so. *See id.* Since it did not, Talbot's signature on the draft was "on behalf of" UPAC, and the case falls squarely within § 3405(a)(2).

This conclusion does not end the inquiry, however. UPAC contends that York is not entitled to the protection of § 3405(a)(2), the fictitious payee exception, if York failed to act in good faith. *See McAdam,* 896 F.2d at 761–62. While UPAC does not contend that York knowingly colluded with the wrongdoers, UPAC argues that York's failure to apply funds consistently with an alleged restrictive indorsement violates the "good faith" requirement. UPAC argues that the preprinted language on the front of the draft, "PAY AND DEPOSIT ONLY TO THE CREDIT OF: _____ INSURANCE CO." with the name "Great American" later typed in on the payee line by Talbot, was a restrictive indorsement. See Diagram A at "3."

York correctly points out that this language on the face of the instrument is not an indorsement at all, but rather the order of UPAC to Landmark to pay the named payee. The term "indorsement" was not defined in the 1979 version of the UCC. The 1990 version now in effect in Pennsylvania defines an "indorsement" as

> *a signature,* other than that of a signer as maker, drawer or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of negotiating the instrument, restricting payment of the instrument, or incurring indorser's liability on the instrument....

§ 3204 (emphasis added). *See also Girard Bank v. Mount Holly State Bank,* 474 F.Supp. 1225, 1233 (D.N.J.1979). This definition, which this court finds persuasive, supports York's argument that the words "PAY AND DEPOSIT ONLY TO THE CREDIT OF" on the draft cannot be termed an "indorsement." An indorsement is a signature. The language on which UPAC relies does not fall within the broad definition of "signature" contained in § 3401(b), which states that "[a] signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature."

Moreover, restrictive language on the instrument does not affect the ability of the named payee to negotiate the instrument by indorsing it. *See* § 3206(a), comment 2. The forged indorsement of Great American, the named payee, does not purport to prohibit further transfer of the instrument.[7] See Diagram B at "1." Such an indorsement, called a "blank indorsement," makes the instrument "payable to bearer and [it then] may be negotiated by delivery alone." § 3204(b). York's acceptance of the draft after it was indorsed in blank by the forger in the name of Great American was thus appropriate and does not evidence any lack of good faith on its part.

UPAC's reply disputes York's characterization of the drafts as bearer paper once indorsed in blank. UPAC bases its

---

6. Talbot did not forge the signature of any UPAC employee on the drafts. Talbot signed in his own name over preprinted language identifying him as "Producer of Record/Broker/Agent." See Diagram A at "1."

7. This court rejects UPAC's argument that the language printed beneath the forged indorsement (see Diagram B at "1") restricts the draft's negotiability in any way.

argument on the undisputed fact that "UPAC had the final say as to whether to accept or reject the drafts presented for payment." However, the statutory provision discussing the effect of indorsements in blank draws no distinctions between checks and drafts. Section 3204(b) states only that "[a]n *instrument* payable to order and *indorsed in blank becomes payable to bearer* and may be negotiated by delivery alone until specially indorsed." (Emphasis added.)

UPAC also argues that regardless of whether the language "PAY AND DEPOSIT ONLY TO THE CREDIT OF" appearing on the front of the draft can be considered a restrictive indorsement, York's failure to follow this language subjects York to liability. The cases UPAC cites for this proposition do not concern the question of a bank's liability. *See Rhone v. State Auto. Mut. Ins. Co.*, 858 F.2d 1507 (11th Cir.1988); *C.R. by Dunn v. Travelers*, 426 Pa.Super. 92, 626 A.2d 588 (1993). As stated above, once the indorsement of Great American, the named payee, was forged in accordance with § 3405(a)(2), the indorsement effectively made the draft payable to bearer despite terms elsewhere on the draft purporting to restrict its transferability.

Next, UPAC claims that York's failure to require an indorsement on behalf of the "Small Businessman's Service Corp." before permitting the draft to be deposited into its account amounted to bad faith which would render the protection of § 3405(a)(2) unavailable. York argues that since the forged indorsement of the named payee in blank made the draft bearer paper, no further indorsement was necessary.

Commentary and case law support York's position. "There is nothing which prevents a bank from making payment to the holder of a bearer [instrument] without requiring such holder to make an indorsement on the [instrument]." 5A Anderson, *supra*, § 3–204:7. It is "common contemporary practice [to] accept[ ] unindorsed checks for deposit." *Perini*, 553 F.2d at 411; *see also* § 4205(a). Accordingly, York's acceptance of the draft for deposit with the purported indorsement of the payee but without the indorsement of its customer does not evidence a lack of good

faith precluding the application of § 3405(a)(2).

UPAC contends, however, that York can still be held liable for other negligent acts by York despite the applicability of § 3405(a)(2). Several of the cases UPAC cites, such as *Engle Ford, Inc. v. Fulton Bank*, 113 Dauph. 164 (C.P.1993) and *Underpinning & Found. Constr., Inc. v. Chase Manhattan Bank, N.A.*, 46 N.Y.2d 459, 414 N.Y.S.2d 298, 386 N.E.2d 1319 (1979), hold that a bank's failure to heed restrictive indorsements will subject it to liability for negligence despite the fictitious payee rule. These cases are inapplicable because, as discussed above, the drafts at issue did not contain restrictive indorsements. Another case cited by UPAC, *Lichtenstein v. Kidder Peabody & Co.*, 840 F.Supp. 374 (W.D.Pa.1993) is inapplicable because it did not involve § 3405(a).

York argues that negligence of a depository bank is immaterial if the bank is protected by § 3405(a). The commentary to the revised version of § 3405(a) supports York's position. Revised § 3405(a) states that under the previous version, applicable in this case, "[t]he fact that the bank acted negligently did not shift the loss to the bank so long as the bank acted in good faith." This court, following "the overwhelming majority of jurisdictions considering the question," holds that "simple negligence" will not bar application of § 3405(a) "to claims resulting from the collecting bank's acceptance of a[n] [instrument] over a forged indorsement." *Shearson Lehman Bros., Inc. v. Wasatch Bank*, 788 F.Supp. 1184, 1193 (D.Utah 1992); *see also In re Lou Levy & Sons Fashions, Inc.*, 988 F.2d 311 (2d Cir. 1993).

Courts have held that depository or collecting banks may be liable despite the applicability of § 3405 where the bank's actions in accepting the instruments are so "commercially outrageous" as to call into question the bank's good faith. *See McAdam*, 896 F.2d at 761. However, UPAC concedes that the drafts "showed no evidence of an 'unauthorized signature or any alteration on an item.'" UPAC cannot establish that the actions of York in accepting facially

regular drafts were so outrageous as to amount to a lack of good faith.[8] York is entitled to summary judgment on UPAC's negligence claims.

■■■ UPAC's claim for breach of warranty of the validity of the indorsements must fail because § 3405(a)(2) makes the forged indorsement effective. *See* Anderson, *supra*, § 3–405:34. As such, this court need not consider York's argument that York's warranties run only to Landmark, not to UPAC. *See* James J. White & Robert S. Summers, 1B *Uniform Commercial Code*, 3d ed. (1993), § 15–5. Similarly, UPAC cannot maintain its conversion claims against York because § 3405(a)(2) operated to make the instrument properly payable.

York is therefore entitled to summary judgment on all counts.

### ORDER

AND NOW, this 29th day of September, 1994, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion for summary judgment of defendant, The York Bank & Trust Co., is GRANTED and that the motion for summary judgment of plaintiff, Universal Premium Acceptance Corporation, is DENIED.

Judgment is entered in favor of defendant, The York Bank & Trust Co., and against plaintiff, Universal Premium Acceptance Corporation.

---

8. UPAC also challenges York's conduct in opening the account in the name of "Small Businessman's Service Corp." UPAC cannot prevail upon this theory because

> [t]he circumstances surrounding the opening of a bank account are irrelevant to the application of [§ 3405] with respect to a check later deposited into that account, as the circumstances surrounding the opening of the account have no bearing on whether the bank acted with honesty as to the subsequent deposits. When the wrongdoer (1) opened a bank

> account, (2) deposited the impostor paper into the account, and (3) withdrew the money from the account, the only concern in determining the applicability of [§ 3405] is whether the bank acted in good faith with respect to the deposit of the impostor paper and the other matters are irrelevant. The concept of course of dealing is not applicable to the impostor rule as the only concern of [§ 3405] is the good faith of the bank with respect to the particular transaction involved.

6 Anderson, *supra*, § 3–405:14.