AMBRO, Circuit Judge,
concurring.
No part of the Court’s substantive analysis of the respondeat superior and Restatement of Agency issues gives pause. I write separately only because I believe that this case presents substantial questions relating to the interplay of the Uniform Commercial Code with these issues. Indeed, the chain of consideration begins with the UCC, for in many cases it may preempt common-law claims. I ultimately conclude that the UCC does not preempt Siemens’s cause of action, and so I join the Court’s opinion. In this context, the UCC’s reach in this area is shorter than it should be, and so I urge its drafters to consider extending the comparative negligence rule of U.C.C. § 3-404(d)[9] to this situation.
I.
“Unless displaced by the particular provisions of [the UCC], the principles of law and equity ... supplement its provisions.” U.C.C. § 1-103. This text leaves the impression that the UCC’s preemptive effects are limited and narrow. Not so. As *199 the Official Comments explain, the UCC’s preemptive reach is actually quite long:
[T]he Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may supplement provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.
U.C.C. § 1-103 cmt. 2 (third and fourth alterations added).[10] Hence, we apply the common law to commercial cases only when (1) the UCC explicitly so provides or (2) the common law supplements the text, purposes, or policies of the UCC without supplanting them.
Article 3 of the UCC regulates negotiable instruments, including checks. Specifically, it apportions liability among drawers, drawees, indorsers, and collecting banks when the check collection process goes awry. U.C.C. § 3-401 to 20. In particular, it provides that when a drawer corporation (here, Siemens) has a faithless employee (Williams) who enriches herself by causing the corporation to issue fraudulent checks, the default rule is that liability falls on the drawer, not the bank, because the UCC renders the faithless employee’s fraudulent indorsement “effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.” U.C.C. § 3-404(b)(2).
This age-old scheme can take many forms. Here, Williams defrauded Siemens by causing it to issue checks payable to employees (current and former), fraudulently indorsing the checks, and cashing them.[11] Section 3-404 by its terms comes into play: it applies when “a person whose intent determines to whom an instrument is payable does not intend the person identified as payee to have any interest in the instrument.” U.C.C. § 3-404 (internal cross references omitted). While the wording no doubt is obtuse, both elements of the section are met here: Williams determined to whom payroll checks were payable,[12] and she did not intend for the named payees to have any interest in them.
*200 The problem here is that Williams was not alone. Tanner, a head teller at a PNC branch, ensured that the scheme succeeded by cashing the fraudulently indorsed checks. Neither Siemens nor PNC , was particularly careful in monitoring its employee’s activities, and Williams and Tanner got away with the scheme for quite a while. Eventually, both employers wised up and are now fighting to determine who will bear the loss.
In run-of-the-mill faithless employee scenarios, § 3^04(d) provides:
[I]f a person paying the instrument or taking it for value or for collection [here, PNC] fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss [Siemens] may recover from the person failing to exercise ordinary care [PNC] to the extent the failure to exercise ordinary care contributed to the loss.
This is a comparative negligence provision. 2 White & Summers, Uniform Commercial Code § 19-2 (4th ed.1995) (referring to the “comparative negligence” rule in 3-404); see also U.C.C. § 3-405 cmt. 4 (“If the trier of fact finds that there was such a failure and that the failure substantially contributed to loss, it could find the depositary bank hable to the extent the failure contributed to the loss.”). In other words, when the employer and the bank are both negligent, a trier of fact should apportion the loss between them to the extent each party’s negligence contributed to the loss.
Whether § 3-404(d) applies here becomes complicated, however, because Siemens does not allege PNC’s actions were negligent, but fraudulent. Specifically, Siemens argues that Tanner’s fraud[13] should be imputed to PNC. If Siemens is correct, then § 3-404 does not apply because it only protects banks that pay instruments “in good faith.” U.C.C. § 3-404(b)(2). Tanner, of course, did not pay the instrument in good faith, and if we impute her fraud to PNC, it did not either. To determine whether we attribute Tanner’s fraud to PNC (and thereby remove this claim from § 3-404’s reach), we must look to state agency law, as the UCC does not provide an answer, and the state law on point does not conflict with the UCC’s text, purposes, or policies. Hence, I agree with the Court that ordinary principles of agency law apply, and they prevent attributing Tanner’s fraud to PNC.
II.
Having disposed of this case, I write further to note that applying state agency law to claims like this one (which are not uncommon) introduces dissonance into a legal regime that should be uniform and predictable. I suggest that the UCC drafters consider explicitly providing the rules of decision in cases in which the drawer’s faithless employee conspires with a bank teller or other line employee.
The symmetry of this case is striking: PNC was negligent in not detecting Tanner’s fraud in the same way that Siemens was negligent in not detecting Williams’s fraud. Yet, respondeat superior threatened to shift liability from Siemens to PNC. In this case, it does not matter because New Jersey’s version of respondeat superior emphasizes whether the employee intended to serve the master. In our case, and in analogous situations, New Jersey (along with many other states) is reluctant to hold a master liable for a *201 servant’s fraud when the servant is acting against the master’s interests. See, e.g., J.D. Edwards & Co. v. Podany, 168 F.3d 1020, 1024 (7th Cir.1999) (applying Illinois law); Am. Bankers Life Assur. Co. of Fla. v. Tri City Bank & Trust Co., 677 F.2d 28, 30 (6th Cir.1982) (applying Tennessee law); Todd v. Skelly, 384 Pa. 423, 120 A.2d 906, 909-10 (1956).
Other states, however, treat these situations differently, holding the master-principal hable so long as the servant-agent, viewed from afar, appears to be about the master’s business, even if the putative agent is acting solely for her own benefit. See, e.g., Dewey v. Lutz, 462 N.W.2d 435, 443 (N.D.1990); Pac. Mut. Life Ins. Co. v. Haslip, 553 So.2d 537, 541 (Ala.1989); Hedley Feedlot, Inc. v. Weatherly Trust, 855 S.W.2d 826, 837 (Tex.Ct.App.1993) (“If an agent is acting within the scope of his general authority, his wrongful act, though unauthorized, will nevertheless subject his principal to liability.”) (emphasis added) (citations omitted); Billups Petroleum Co. v. Hardin’s Bakeries Corp., 217 Miss. 24, 63 So.2d 543, 546 (1953); McCarthy v. Brockton Nat’l Bank, 314 Mass. 318, 325-26, 50 N.E.2d 196 (1943).
Perhaps more importantly, even in states like New Jersey respondeat superi- or liability turns on the subjective “state of the servant’s mind,” which, as the Restatement notes, is typically provable only by circumstantial evidence. Restatement (Second) of Agency § 235 cmt. a (1958). This inquiry is naturally fact-intensive, and in cases involving the same basic facts (faithless employees conspiring to use the checking system to defraud their employers) factfinders can nonetheless reach opposite liability determinations because of differences in nuance and inference.
The same basic situation is treated differently in different states (and can be treated differently by different factfinders in the same state). While this is a normal and, in some circumstances, salutary effect of our federal-state system, the motivating logic of the UCC is that the law applying to certain commercial transactions should, for efficiency and predictability reasons, be uniform. See Karl N. Llewellyn, Why We Need the Uniform Commercial Code, 10 U. Fla. L.Rev. 367, 372 & 381 (1957). Long ago the UCC drafters (and before them the Negotiable Instruments Law drafters) determined that the banking system and its attendant routine transactions were ripe for standardization. Id.; see also Ralph L. Abercrombie, Article 4: Bank Deposits and Collections, 15 Okla. L.Rev. 287, 287 (1962). Following the deregulation of interstate banking in the 1990s, it is more important than ever that the check collection process be governed by rules of decision that do not vary from state to state.
Moreover, it is worth noting that § 3-404 altered the substantive pre-Code law to relieve banks of liability when customers’ employees used the check collection system to steal from their employers. According to White and Summers, the purpose of § 3-404 is to shift liability to employers who fail to take care in supervising employees who control their check-writing:
The drafters have concluded that the employer should bear the responsibility for the forgery of certain embezzlers— those who have “responsibility with respect to instruments,” i.e., treasurers, payroll clerks, programmers of sensitive computer programs, and the like. These people are known by the employer to have the keys to the bank. In some cases they will be bonded. All employers should have procedures that encourage these people to be trustworthy and that expose them when they are not.
2 White & Summers § 19-4 (emphasis added). Indeed, the insistence on employ *202 er liability is so strong that in a prior version of Article 3 the drawer had no recourse at all against a negligent bank. U.C.C. § 3-405 (1952). In the current version, however, the drafters have recognized that bank negligence could justify a sharing of liability, and so they have provided for comparative negligence. Id. When a bank employee is negligent — or even grossly negligent — in cashing the drawer’s fraudulently indorsed check, the factfinder apportions liability between the negligent employer and the negligent bank according to well-worn comparative negligence principles.
The UCC’s comparative negligence rule should be expanded to cover situations in which both the drawer and the bank have faithless employees because it is inexplicably asymmetric for the applicable rule of decision (UCC comparative negligence or respondeat superior) to turn on whether a low-level bank employee was involved in the fraud. At present, if the drawer’s faithless employee acts alone, the rule of decision is UCC comparative negligence, but if she acts in concert with a low-level bank employee, respondeat superior sometimes shifts liability to the bank alone. At first blush, applying respondeat superior, rather than UCC comparative negligence, to such cases might seem of little moment given that comparative fault is now the preferred approach to all tort liability. See Restatement (Third) of Torts: Apportionment of Liability § 1 (2000). Thus, even under a respondeat superior rubric, the bank would be able to use the drawer’s negligence to limit its liability.
The wrinkle is that the comparative fault inquiries under each approach differ. Under an expanded § 3-404, the jury would compare the conduct of two negligent employers. Under respondeat superior, the jury compares the drawer’s negligence with the bank’s imputed fraud. Comparing negligence to negligence is not the same as comparing negligence to fraud, as intent to harm becomes part of the comparative fault equation. Restatement (Third) of Torts: Apportionment of Liability § 8(b). Indeed, considering the bank employee’s intent to defraud could move a jury to impose more liability on the bank than it would were it comparing negligence with negligence.
More important for our case, the UCC provides a three-year statute of limitations. U.C.C. § 3-118(g). In New Jersey (and many other states), statutes of limitations for common-law claims are longer. Indeed, the statute of limitations issue may be the only reason Siemens did not proceed with a UCC claim. Here, Siemens delayed bringing its claim until after the UCC’s limitations period had expired; thus, it asserted common-law claims to get around the UCC’s time bar. The UCC’s limitations period reflects the drafters’ decision that employers seeking to shift part of their loss to banks must bring suit within three years. I see no reason for the mere involvement of a teller to change that by providing employers with an “end-around” this limitations period by styling their suits as non-UCC actions.
I do not advocate UCC preemption in the event that the principals of the bank are implicated in a fraudulent scheme. See Brighton, Inc. v. Colonial First Nat’l Bank, 176 N.J.Super. 101, 422 A.2d 433 (1980) , aff'd 86 N.J. 259, 430 A.2d 902 (1981) . There I agree with the UCC’s usual practice of leaving this type of serious commercial fraud to the law of torts. Section 3-404 regulates only low-level fraud by faithless employees because those schemes are common, and they operate through the normal channels of the check collection process. Following that principle, I urge that the UCC extend to reach the not untypical collection problem that *203 arises when both the drawer and the bank have faithless employees. I would not advocate delving into what New York law terms “commercial bad faith,” that is, bad faith acts that implicate bank managers with “ ‘actual knowledge’” of the fraud. See Calisch Assocs., Inc. v. Mfrgs. Hanover Trust Co., 151 A.D.2d 446, 542 N.Y.S.2d 644, 645-46 (N.Y.App.Div.1989) (quoting Prudential-Bache Sec., Inc. v. Citibank N.A., 73 N.Y.2d 263, 539 N.Y.S.2d 699, 536 N.E.2d 1118,1124-25 (1989)).
^ ^ ^ ^
Because I agree that the UCC does not reach the situation presented here, I join the Court’s opinion. I, however, urge the UCC drafters to consider redrafting § 3-404 to extend the comparative negligence rule to situations in which a drawer’s faithless employee conspires with a teller or other line employee of the bank to cash fraudulent checks.

. Unless otherwise noted, all references to Article 3 of the U.C.C. are to the 1990 version.

. I recognize that the 2001 revisions to Article 1 of the Uniform Commercial Code quoted here have not been officially adopted by the New Jersey Legislature. However, the drafters of the UCC note that "except for changing the form of reference to the [UCC] and minor stylistic changes," revised § 1-103 simply combines former sections 1-102 and 1-103 to "reflect the interrelationship" between the two sections. UCC § 1-103 cmts. Thus, my reliance on revised § 1-103 is in line, as it is not substantively different from former §§ 1-102 & 103.

. This scheme took three forms: Williams caused Siemens to issue (1) two payroll checks to a single employee, one of which went to the proper payee, the other of which she misappropriated; (2) payroll checks to terminated and suspended employees, which she misappropriated; and (3) checks for overtime pay that employees did not earn, which she misappropriated.

. Under § 3-110(a), the person who signs a check on behalf of the drawer determines to whom the check is payable. Here, Williams stamped the checks with the appropriate signatures, and so she determined to whom they were payable.

. That Tanner's acts were fraudulent (as opposed to negligent or grossly negligent) is not in dispute.