WESLEY, Circuit Judge,
dissenting:
In concluding that a request to cure was not a condition precedent to Morgan Stanley’s repurchase obligation and that issues of fact preclude summary judgment, the majority opinion both misapplies New York law and misreads the plain language of the contract. The result is, in essence, judicial reformation of the agreement, saving a sophisticated party from the requirements of the bargain it made following arms-length negotiation. Because I cannot agree with these conclusions, I respectfully dissent.
*314 It is indeed the case that New York law requires conditions precedent to be “express” — that is, stated by the parties in “unmistakable language.” Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690-91, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995) (internal quotation marks omitted). But there is no indication in Oppenheimer that the standard of “unmistakable language” — which the Court drew from the Second Restatement of Contracts — requires specific, tálismanic words. See Oppenheimer, 86 N.Y.2d at 691, 636 N.Y.S.2d 734, 660 N.E.2d 415 (quoting Restatement (Second) .of Contracts § 229 cm't. a (1981)).- In fact, the Restatement clearly rejects that view: “No particular form of language is necessary to make an event ■ a condition, although such words as ‘on condition that,’ ‘provided that’ and ‘if are often used for this purpose. An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language.” Restatement (Second) of Contracts § 226 cmt. a.[1]
A recent case of the Court of Appeals confirms this analysis: the Court construed a provision requiring negotiation and execution of additional terms as an express condition precedent to a party’s obligation to supply fiber-optic capacity but relied on no conditional words, identifying the parties’ “clear intent” solely from the nature and structure of the agreement. See IDT Corp. v. Tyco Grp., S.A.R.L., 13 N.Y.3d 209, 212, 214, 890 N.Y.S.2d 401, 918 N.E.2d 913 (2009).[2] Similarly, lower New York courts have concluded that an express condition precedent exists “despite the lack of explicitly conditional language” so long as it “was unmistakably required” before another obligation came into forcé. ALJ Capital I, L.P. v. David J. Joseph Co., 48 A.D.3d 208, 208, 851 N.Y.S.2d 154 (1st Dep’t 2008) (emphasis added); see also Walton v. E. Analytical Labs, Inc., 246 A.D.2d 532, 533, 667 N.Y.S.2d 407 (2d. Dep’t 1998) (finding condition precedent premised on the structure of the provision, notwithstanding the lack of1 conditional language); Winfield Capital Corp. v. Mahopac Auto Glass, Inc., 208 A.D.2d 715, 715, 617 N.Y.S.2d 499 (2d Dep’t 1994) (same). ‘ In New York courts, therefore, specific words are strong evidence of, but not necessary to, conditions precedent; the core inquiry, as in all contracts,” is to give effect to the parties’ “clear intent,” as expressed through the “unmistakable language” they use.
So what then does the language and structure of the contract — negotiated at arms’ léngth by sophisticated commercial entities — tell us' about breaches of the agreement and the remedies provided for those breaches? For ease of reference, here again are the three obligations as identified in the majority opinion, ante, at 304:
1. If a material breach exists, “the party discovering such ... Material Breach ■shall promptly notify, in writing, the other party....” >
*315 2. “Promptly (but in any event within three Business Days) upon becoming aware of any such ... Material Breach, the Master Servicer shall, and the Special Servicer may,- request thát the Seller, not later than 90 days from the Seller’s receipt of the notice of such ... Material Breach, cure such ... Material Breach____” •
3. “The Seller hereby • covenants and agrees that, if any such ... Material Breach cannot be corrected or cured in all material aspects within the above cure period[], the Seller shall, on or before the- termination of such cure periodic], either (i) repurchase the affected Mortgage Loan ... or (ii) ... at its option replace, without recourse, any Mortgage Loan ... to which such defect relates with a [substitute mortgage].”
J.A. 454-55. We can all agree the third clause clearly conditions Morgan Stanley’s repurchase-or-replace obligation on the existence of a particular circumstance: that “any ... Material Breach cannot be corrected or cured in all material aspects within the above cure period [ ].” J.A. 455 (emphasis added); see Majority Op.,, ante, at 306 (identifying this clause as an example of “unmistakable language of condition”). Similarly, we agree that this language makes the repurchase obligation dependent on the obligation to cure within the cure period. But where the majority opinion and I depart is whether that obligation to cure within the cure period arises from the notice of breach or from the request to cure.
The majority opinion concludes that because the ninety-day period is calculated from the date of the notice of breach, the cure period must be triggered by the notice. See Majority Op., ante, at 307 (“[A]s the MLPA makes clear, that cure period is triggered exclusively by ‘the Seller’s receipt of the notice of ... Material breach,’ not the Servicer’s request for cure.” (quoting J.A. 454)). I cannot agree: A ninety-day clock may count down from the notice of breach, but it is only the request to cure that gives, that clock any legal meaning. The ninety-day cure period is written as a clause in the middle of the request provision, which states that “the Special Servi-cer may[ ] request that the Seller, not later than 90 days from the Seller’s receipt of the notice of such ... Material Breach, cure such ... Material Breach.” J.A. 454 (emphasis added). In other words, the ninety day's and their legal significance are a part of the Special Servicer’s request.' If there were no' request, ninety days' would pass — in time’s typical fashion — but it would not be a legally significant “cure period” for purposes of the repurchase obligation because no .one had requested cure by that date.
The' majority opinion seems disturbed by the fact the deadline for cure is not counted down from the request for cure and so concludes that the request itself has no conditional force over the repurchase obligation. But the repurchase obligation depends on the Seller not curing the breach within the cure period; that circumstance can only exist if the Special Servicer first makes a request to cure, which includes (and creates) the obligation to cure and the legal deadline for it. Nothing about the fact that the deadline is established ninety days after another event changes the fact that it is the request that brings it into existence. For example, imagine two parties enter into a contract that reads: “Upon, becoming aware of a material breach, the Special Servicer may request'that the Seller,’not later than ten days following the next full, moon, cure such material breach.” An. obligation to cure within the cure period does not come into existence as a result of the lunar cycle; it is triggered by the request — the “not later than” clause simply provides a way to determine the deadline by which *316 the Seller must comply. Put simply, the request identifies an object (cure) and a deadline (ninety days following a particular identified event); absent any request, there is no object and no deadline.[3]
This interpretation is confirmed by a simple counterfactual: If the Special Ser-vicer had exercised its option not to request cure, would Morgan Stanley still have been obliged to cure or repurchase the loan? The answer — on the plain face of the contract — must be “no.” The contract is conspicuously lacking any language making cure of every material breach .obligatory on the Seller absent a request to cure.[4]. To construe the contract in that way would require reading the repurchase obligation as creating, sub silentio, an obligation to cure that arises simply from notification of breach.[5] It is simply unfathomable that the parties would silently imply, rather than lay out explicitly, such a significant obligation as one requiring cure of every material breach for which a notice of breach was transmitted. Instead, the parties explicitly conditioned the repurchase obligation on the running of the cure period without actual cure, and the cure period only comes into existence through the Special Servicer’s request.[6]
Compare-this framework with the provisions considered by district courts-in our *317 Circuit that have concluded timely notice did not constitute a condition precedent to repurchase obligations: in those cases, the obligation was triggered by either a party’s discovery of its own breach or its counterparty’s notification — i.e., the obligation could come into existence through a mechanism other than a request to cure. See LaSalle Bank Nat’l Ass’n v. Citicorp Real Estate, Inc., No, 02 Civ. 7868(HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003); Tr. for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp., No.. 04 Civ. 9890(SAS), 2005 WL 2582177, at *7 (S.D.N.Y. Oct., 11,2005); see also U.S. Bank Nat’l Ass’n v. Dexia Real Estate Capital Mkts., No. 12-CV-9412, 2014 WL 3368670, at *4 (S.D.N.Y. , July 9, 2014), rev’d on other grounds, No. 14-2859-ev, 643 Fed.Appx. 48, 2016 WL 1042090 (2d Cir. Mar. 18, 2016) (summary order). Here, by contrast, there is. .no indication anywhere in the contract that Morgan Stanley’s discovery- of its own breach requires it to do anything other than “promptly notify, in -writing, the other party.” J.A. 454; see Morgan Guar. Tr. Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co., No. 00 CIV. 8613(SAS), 2002 WL 818082, at *4-5 (S.D.N.Y. Apr. 30,2002) (concluding that a request to cure was necessary to begin cure period, the expiration of which required the seller to repurchase the loan).
In sum, regardless of whether the parties used any particular conditional words, the language of the repurchase obligation is “clear” and “unmistakable” that it arises only when cure does not occur within the cure period — and cure within the. period is an obligation that arises only out of the Special Servicer’s request. See ALJ Capital, 48 A.D.3d at 208, 851 N.Y.S.2d 154.[7] Because the language and structure of the provision makes the repurchase obligation unmistakably contingent on the Special Servicer’s request to cure, that request must necessarily constitute -an express condition precedent. See IDT Corp., 13 N.Y.3d at 214, 890 N.Y.S.2d 401, 918 N.E.2d 913.
Express conditions precedent are subject to “the requirement of strict compliance,” in contrast to promises or constructive conditions, with which only “substantial compliance” is required. Oppenheimer, 86 N.Y.2d at 690, 692, 636 N.Y.S.2d 734, 660 N.E.2d 415 (internal quotation marks omitted). Further, “no mitigating standard of materiality or sub-stantiality [is] applicable to the non-occurrence of [an express condition precedent].” Id. at 692, 636 N.Y.S.2d 734, 660 N.E.2d 415 (internal quotation marks omitted). Consequently, once we determine that a request to cure “within three Business Days[] upon becoming aware” of the material breach, J.A. 454,- is an express condition precedent to the repurchase obligation, the only remaining question on summary judgment is whether there exists any genuine issue of material fact as -to the Special Servicer’s strict compliance with that condition. Under longstanding New York law, no reasonable factfinder could determine that the Special Servicer only became aware of *318 the material breach on or after March 15, 2009 — ie., three days before the date of the request to cure.[8]
As the majority opinion; explains, the material breach identified here is premised on .Morgan Stanley’s representation that it had no knowledge , of any “material- and adverse environmental condition or circumstance affecting any Mortgaged Property that was not disclosed in such report.” J.A. 625; see also Majority Op., ante, at 301 & n. 3. The Special Servicer’s conclusion that a breach of this representation had occurred .rested primarily on a document showing that Morgan Stanley’s counsel knew the environmental report neither addressed a relevant state regulation, nor the notices of violation, issued thereunder; in fact, this was the only piece of evidence identified in the formal, notice of breach and request to cure. See J.A. 625-26. However, in a document sent to the Special Servicer’s Associate General Counsel on February 16, 2009, the Director of Special Servicing — and the woman who ultimately signed the notice of breach and request to cure — identified, “additional facts ,.. to demonstrate the material and adverse effect” of the breach, including the anchor tenant’s departure -and subsequent lease terminations by other tenants, “discontinued ... loan payments to the Trust in November 2008 as a- direct result of insufficient operating income,” and rejection of the borrower’s insurance claim under a pollution legal liability policy. J.A. 896-98.
The majority opinion’s approach places great weight on the internal governance structure of,the Special Servicer, essentially permitting the corporation to deny its “awaréness” of a fact simply because it required authorization by the president to issue the notice. See Majority Op., ante, at 310-12. But “a fundamental principle that has informed the law of agency and corporations for centuries” is that “the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals.” Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010); accord Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 68, 126 N.E. 260 (1920) (explaining that, if the employee of a corporation obtains knowledge “while acting within the scope of his authority, on behalf of [the corporation], for its benefit, [the corporation] is chargeable with his knowledge”).[9] - This presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors:
[Njotice of facts to an agent is constructive notice thereof to the principal himself, where it arises from or is at the time connected with the subject-matter of his agency, for, upon general principles of public policy, it is presumed that the agent has -communicated such facts *319 to the principal, and, if he has not, still the principal having- .[ejntrusted the agent .-with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal.
Hyatt v. Clark, 118 N.Y. 563, 569, 23 N.E. 891 (1890); accord N.Y. Univ. v. First Fin. Ins. Co., 322 F.3d 750, 753 & n. 2 (2d Cir.2003) (applying these principles to a timeliness inquiry and calculating the insurer’s delay in notice from the date its investigator discovered grounds for liability); Apollo Fuel Oil v. United States, 195 F.3d 74, 76-77 (2d Cir.1999) (applying the same rule to conclude the corporation knew of intentional misconduct through its' employees’ knowledge). This rule applies even where such. knowledge works the waiver of a contractual right and the corporate agent does not have any authorization under the contract to make such a waiver affirmatively. See, e.g., Hurley v. John Hancock Mut. Life Ins. Co., 247 A.D. 547, 550, 288 N.Y.S. 199 (4th Dep’t 1936).
Put simply, as a matter of law, the Special Servicer knew the facts of the breach and their material and adverse effect on the loan well before March 15, 2009,. The Director of Special Servicing drafted a memorandum containing sufficient facts to constitute awareness of both the breach and its material and adverse. effects on February 16, 2009.[10] Even after that, on February 19, 2009, an Associate General Counsel at the company confirmed that “there is evidence that [Morgan Stanley] knew” there were undisclosed environmental conditions in breach of the representation and concluded “I think that the breach notice should be' sent.”. J.A. 1266. Yet, despite two employees responsible for investigating material breaches concluding there was sufficient evidence of such a breach, no notice was sent until March 18, 2009, during which time no new material facts were obtained by the Special Servi-cer. Though the Trustee’s brief makes much of the fact that neither the “Director of Special Servicing nor the Associate General Counsel had authority to issue a.notice of breach, authority to make the ultimate decision is irrelevant to imputation; what matters - is whether the knowledge was obtained within the scope of the employee or agent’s employment. See N.Y. Univ., 322 F.3d at 753 & n. 2; Hyatt, 118 N.Y. at 569, 23 N.E. 891; Hurley, 247 A.D. at 550, 288 N.Y.S. 199. There can be.-no dispute that the Director of Special Servicing,, who ultimately signed the formal notice of breach and request to cure, see J.A. 626, obtained her knowledge of the breach and its effects in the scope of her ‘authority to investigate potential breaches. See J.A. 1110-11; see also N.Y. Univ., 322 F.3d at 753 & n. 2 (calculating delay in insurance coverage denial from the date the investigator learned of the. grounds for denial, notwithstanding his lack of authority to deny coverage himself).
Just as importantly, none of the post-February 16 activities described by the majority opinion.contributed in any material way to the Special Servicer’s “awareness” of any breach. None of the internal “chain of command” reviéws — not the removal of one paragraph of supporting facts from the notice and request to cure by the Associate General Counsel, see J.A. *320 1341-45, nor the approvals without change by both a senior managing director and the president of the company, see J.A. 1347, 1829-30 — made any additional facts available to the corporation, either of the nature of the breach or of its material and adverse effects. The only potentially new fact arose from the appraisal setting the collateral’s market value at $22.3 million, the initial estimate of which was received on February 27,2009. See J.A. 1739. The Trustee argues that this appraisal was needed “to confirm that Morgan Stanley’s breach was ‘material’ under the terms of the MLPA.” Appellant Br. 17. But this lone data point could hardly have tipped the scales of the Special Servicer’s awareness of the breach’s materiality in light of what it already knew as of February 16, 2009:
(1) The loan was in default;
(2) The anchor tenant had departed, which precipitated rent reductions, lease terminations, and discontinued rent payments by other tenants;
(3) An Ohio regulatory body had filed a lawsuit against the borrower arising from the same environmental regulatory violations at issue in the breach;
(4) The borrower’s insurance claim for the legal liability was denied;
(5) The Trust was seeking receivership for the property; and
(6) The Trust would have to fund any legal costs associated with attempts to recoup value.
See J.A. 619, 897-98. The substantive portion of the February 16, 2009 memorandum concluded with these words: “All of the above results, stem from the state code violations which were present prior to, during and after the sale of the Mortgage Loan to the Trust. The Mortgage Loan should be repurchased pursuant to the terms and conditions set forth in the PSA and the applicable MLPA.” J.A. 898. It exceeds all bounds of credulity to think that, in the face of all these known facts, the Special Servicer was anything but aware of the circumstances of the breach as well as its material and adverse consequences.[11]
The majority opinion’s approach thus drastically departs from New York law governing corporate knowledge and timely request obligations under a contract. Under the majority opinion, all any corporation need do now is require authorization for such requests at its highest level — and regardless of the facts known by employees below the highest executive officer, the corporation cannot be charged with “awareness” of those facts.[12] Not only is *321 this type of passing-the-buck approach wholly contrary to “a fundamental principle that has informed the law of agency and corporations for centuries,” Kirschner, 15 N.Y.3d at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941, but it would completely defeat the purpose of a temporal limitation on a contractual remedy — namely, the valuable certainty and diligence obtained when a sophisticated counterparty must exercise that remedy within a defined' period of time. Particularly when a timely request is a condition precedent to a contractual remedy, requiring strict compliance, the majority opinion’s approach dramatically undercuts the force and value of such provisions.
The Oppenheimer Court considered and rejected a rule that would obviate the harsh consequences of an express condition precedent, concluding that strict compliance was necessary. See 86 N.Y.2d at 691-92, 636 N.Y.S.2d 734, 660 N.E.2d 415. Yet the majority opinion here releases a sophisticated party from thé burden of complying with the agreement it made. At the risk of stating the- obvious, if the corporation’s internal governance did not permit a three-day turnaround between awareness of breach and a request ‘to cure, it should have bargained for more time.[13] On these facts, no reasonable factfinder could determine that the Special Servicer only became aware of the breach on or after March 15, 2009. As a result, no reasonable factfinder could find strict compliance with the condition precedent to Morgan Stanley’s repurchase obligation, and that obligation never came into force.
1 respectfully dissent.

. Oppenheimer itself also relied on a case in which absolutely no conditional language appeared; the contract simply required notice of' shipment of goods, and the failure to provide such notice was deemed a “failure to ‘perform[ ] all conditions precedent’ ” and "barred [plaintiff] from recovery.” 86 N.Y.2d at 693-94, 636 N.Y.S.2d 734, 660 N.E.2d 415 (first alteration in original) (quoting Jungmann & Co. v. Atterbury Bros., 249 N.Y. 119, 122, 163 N.E. 123 (1928)).

. Stepping back, it makes sense that the request to cure calculates its deadline from the notice of breach. Either party — -the Seller or the Special Servicer — may be the one to discover the breach in the first instance and must then notify the other party. See J.A. 454. If the Seller discovers the breach and provides notice, the Special Servicer then has three days to decide whether to request cure or lose its right to do so. If it chooses to exercise its right to request cure on day three, there may be only eighty-seven days until the end of the cure period — but the Seller already had three days of notice, by its own discovery, of the nature and circumstances of the breach. By contrast, if the Special Servicer discovers the breach, it can both notify the Seller of breach and request cure in the same document, in which case the Seller has the same ninety days of notice. In either event, , this system ensures that the .Seller has exactly ninety days of knowing about the breach, no more and no less, before the deadline occurs.

. The majority opinion suggests this consideration is irrelevant because the MLPA-assigned the signaling function to -the notice of breach and because the Master Servicer had a "mandatory request-for-cure obligation.” Majority Op., ante, at 307 n. 10. However, the loan at ' issue was transferred to the Special Servicer ,in-November 2008, see Majority Op., ante, at 301, at which point the Master Servicer ceased to be "obligated to service and administer” the loan except as to certain specified functions, none of which include requesting cure, see J.A, 217. Only the Special Servi-cer’s contractual rights and obligations are therefore relevant, and while the MLPA provided that the Master Servicer "shall” request cure, it provided only that the Special Servi-cer "may” request cure. J.A. 454. "May” in this context can only possess a permissive, rather than mandatory, meaning, see N.Y. State Elec. & Gas Corp. v. Aasen, 157 A.D.2d 965, 967, 550 N.Y.S.2d 223 (3d Dep’t 1990), and the MLPA thus imposed no obligation on the Special Servicer to request cure. As I have explained, notice of a breach does not trigger the obligation to cure the breach — the request to cure, is what obliges the Seller to cure within the defined cure period. A request to cure by the Special Servicer,, therefore told the Seller that the former was exercising its option to demand cúre, providing exactly the same signaling and demand functions as the notice of disallowance in ALJ .Capital. See infra note 7; see also Majority Op., ante, at 307 (acknowledging AU Capital’s notice as a condition precedent).

. ■ As described above, if the Special Servicer decides not to request a cure, then the date of the notification of breach has no legal .significance — ninety days later, nothing happens, and no one cafes.

, The majority opinion appears distracted by the District Court’s "notice.to cure” misnomer — but we are engaged in de novo review, and even if we were applying a more deferential standard, we are certainly not obligated to accept the District Court’s labels.

. In fact, AU concerned just such a timely notice provision triggering a cure period, after which time the plaintiff was permitted to -seek recovery-in court. See ALJ Capital I, L.P. v. David J. Joseph Co., 15 Misc.3d 1127(A), 2007 WL 1218355, at *4-5 (N.Y.Sup.Ct. Mar. 13, 2007). The First Department affirmed the trial court’s conclusion that timely notice was "a condition precedent "despite the lack of explicitly conditional language” because the written notice "whs unmistakably required by the agreement’s 'Cure Period’ provision prior to the assertion of a claim for repayment.” ALJ Capital, 48 A.D.3d at 208, 851 N.Y.S.2d 154.

. Because the majority opinion concludes the request to cure was merely a promise, it analyzes the facts under the rubric of substantial compliance and concludes summary judgment, is inappropriate because reasonable factfinders may differ as to the extent of any "reasonable investigation” including "some , degree of chain-of-command review.” Majority Op., ante, at 310-12. Even under a substantial compliance analysis, however, as explained infra, New York law and the undisputed facts would require us to conclude that the Special Servicer became aware of the breach as of at least February 16, 2009.

. As' a corporate legal entity, the Special Ser-vicer "necessarily functions through human actors — its officers, agents and ■ employees— whose knowledge and conduct may be imputed to the entity under the doctrine of respon-deat superior.” Prudential-Bache Sec., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 276, 539 N.Y.S.2d 699, 536 N.E.2d 1118 (1989).

. Note also that this memorandum was based on an investigation of the loan’s status beginning in November 2008. See J.A. 1109-15. Thus," we are not even considering a situation in which the corporation merely had access to (and thus only arguably constructive notice of) these facts — the February 16/2009 memorandum memorializes facts actually known by the Director of Special Servicing. See J.A. 1111-17. To borrow the majority opinion’s analogy, see Majority Op., ante, at 311 n. 11, she was aware both that she had found the Americas (the fact) and that they were new (its significance).

. Even accepting the dubious proposition that confirmation of the loan valuation somehow moved the Special Servicer from "unaware” to "aware,” that appraisal was confirmed on March 13, 2009. See J.A. 1730; Majority Op,, ante, at 302. It took another five days for the Special Servicer to send the notice of breach and request to cure. See J.A, 624-26.

. The majority opinion criticizes this dissent for not citing cases related to investigations by agents and employees. See Majority Op., ante, at 311 n. 12. However, our prior decision in New York University offers precisely this situation; a line investigator at a company contracted as an insurer’s agent discovered grounds for denying coverage, and that knowledge was imputed to the insurer for purposes of determining timeliness. See 322 F.3d at 753 & n, 2. The majority opinion’s error arises from its failure to recognize that investigation was clearly within the scope of the Director of Special Servicing’s employment, regardless of her ability to take some subsequent external action on behalf of the company. The results of her investigation— i.e., knowledge of the facts and significance of breach — are therefore imputed to the Special Servicer, who must then take whatever steps are necessary in its internal governance structure to act within the time provided by the contract.

. “Freedom of contract prevails in an arm's length transaction between sophisticated par- . ties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so was at the bargaining table.” Oppenheimer, 86 N.Y.2d at 695, 636 N.Y.S.2d 734, 660 N.E.2d 415 (alteration and internal quotation marks omitted).